305 Ga. 391
FINAL COPY

S18A1610. CROUCH v. THE STATE.

ELLINGTON, Justice.

A Houston County jury found Coleman Lawrence Crouch guilty of malice murder, felony murder, aggravated assault, and concealing the death of another person in connection with the fatal shooting of Ruben Miranda and Shaland McConnell.[1] On appeal, Crouch contends that the trial court abused its

---

[1] The crimes occurred on August 18, 2013. On March 10, 2015, Crouch, Thomas Andrew Kelly, Justice Bernard Evans, and Kristen Ann Beuthin were indicted for two counts each of malice murder, felony murder predicated on aggravated assault of the victims, aggravated assault, and concealing the death of another. Crouch's co-defendants entered guilty pleas, and Crouch was tried alone. Following a trial conducted June 7-10, 2016, a jury returned a guilty verdict on each count. On June 13, 2016, the trial court sentenced Crouch to life imprisonment for each count of malice murder, to run concurrently, and ten years' imprisonment on each count of concealing the death of a person, to run consecutively, for a total of life plus twenty years. The court determined that the felony murder verdicts merged with the malice murder convictions, although the felony murder verdicts were actually vacated by operation of law; the court correctly determined that the aggravated assault verdicts merged with the malice murder convictions. See *McCullough v. State*, 304 Ga. 290, 294 (818 SE2d 520) (2018) (where an aggravated assault, which was the predicate felony for a felony murder charge, was the same shooting that caused the death of the victim, the aggravated assault verdict merged with the malice murder conviction and the felony murder verdict was vacated as a matter of law); *Lucky v. State*, 286 Ga. 478, 481 (689 SE2d 825) (2010). Crouch filed a motion for new trial on June 14, 2016, which his new appellate counsel amended on February 15, 2018. After a hearing on May 21, 2018, the court denied the motion for a new trial on June 20, 2018. Crouch filed a timely notice of appeal, and his

discretion in excluding evidence of the mental health problems of his co-defendant, Thomas Andrew Kelly, and Kelly's mental state at the time of the shootings. Crouch also contends that his trial counsel was ineffective in failing to develop and adduce such evidence. Finding no reversible error, we affirm.

Viewed in the light most favorable to the prosecution, the evidence presented at trial showed the following. In January 2013, Crouch lost a package containing a half kilogram of cocaine that he was transporting for Miranda, when he jettisoned the package because he was approaching a police roadblock. Miranda demanded $15,000 in compensation for the lost cocaine. Miranda repeatedly pressured Crouch to satisfy the debt, ultimately threatening to rape Crouch's mother and kill Crouch, his parents, and his girlfriend. In August 2013, Crouch told his roommate and Kelly that he wanted to kill Miranda. Kelly suggested that they dispose of Miranda's body at Kelly's family's property in Vinson Valley, which is in Houston County. Miranda was scheduled to meet with Crouch on August 18, 2013; Miranda told Crouch he expected to collect $5,000 from him then. Crouch told Kelly and Kristin Ann Beuthin, Kelly's

_____

appeal was docketed in this Court for the August 2018 term and orally argued on November 8, 2018.

fiancée, that he planned to "get rid of" Miranda that day so he would not have to pay his debt to Miranda. Crouch planned that, when Miranda arrived at his house, Kelly would follow Miranda into the house, Crouch would then walk upstairs under the pretext of retrieving a firearm to offer Miranda to settle his debt, and then Kelly would shoot Miranda in the back of the head to kill him. Crouch and Kelly would then dispose of the body.

Before Miranda arrived on the evening of August 18, Crouch asked Kelly and Beuthin to go to Walmart to purchase a tarp to dispose of Miranda's body, which they did. After returning to Crouch's house, Beuthin told Crouch that she did not want Kelly and herself to be a part of the killing; Crouch slammed his fist on the table and told her that it had to be done that day. Crouch and Kelly then discussed the plan in greater detail. Crouch called another friend, Evans, and told him that he wanted to see him. Evans and his girlfriend, Amy Patricia Walker, met Crouch, Kelly, and Beuthin at a gas station and followed them to Crouch's house. Crouch then discussed the plan to kill Miranda with Evans.

Early in the evening, Crouch and Kelly left the house to pick up Miranda from a Groome Transportation shuttle stop and returned with Miranda and McConnell, who was traveling with Miranda. Crouch told Miranda he only had

$800, and he proposed trading firearms to settle part of his debt. When the four men arrived and walked inside the house, the tarp was spread out in the living room. Crouch told Beuthin and Walker to stay outside. While Kelly and Evans remained in the living room with Miranda and McConnell, Crouch went upstairs to his bedroom and brought an assault rifle for Miranda to consider. Miranda rejected the first weapon, and Crouch went back up to his room ostensibly to retrieve more firearms. When Crouch started coming back down the stairs, Kelly shot Miranda and then McConnell. After Kelly checked to be sure the victims were dead, Crouch checked the victims' pockets and took their cell phones and identification. With a "nonchalant" demeanor, as described at trial by Evans, Crouch organized the clean up process. Crouch, Kelly, and Evans dragged the victims' bodies downstairs to the garage. The three put the victims in the back of Kelly's truck and put the tarp over the bodies. Kelly left in his truck with the bodies in the truck bed.

Beuthin and Walker entered the house and saw blood on the walls and floor, a bullet hole in the wall, and furniture askew. The women helped Crouch and Evans start cleaning the room. At Crouch's instruction, they went to Kroger to purchase bleach, returned, and continued cleaning. Crouch destroyed the

4

screens of the victims' cell phones, removed the phone batteries, and attempted to destroy the victims' identification. Crouch and Evans left with a garbage can that included items used to clean the murder scene and met Kelly at his family's property in Vinson Valley. The three rode in Kelly's truck farther back into the woods on the property and together they dragged the bodies off the truck and into the woods, leaving the bodies and the trash can that contained the cleaning materials covered by the tarp.

Around midnight, Crouch's roommate, who had been out of town the previous day, returned home. He noticed bullet holes in the living room and the overwhelming smell of bleach. Crouch told him that a gun deal had gone wrong, Kelly shot Miranda and another person in the living room, and the bodies were moved to Vinson Valley. At around 5:30 a.m., Crouch's roommate informed law enforcement of Crouch's disclosure about the shooting deaths and reported that Crouch had talked about killing Miranda during the previous week and that Kelly had suggested his family property in Vinson Valley for disposing of the body.

Officers quickly responded to Crouch's house and arrested him. During a custodial interrogation, investigators convinced Crouch to take them to the

5

location of the bodies of the victims. Crouch rode with officers and led them to the location of the victims' bodies. Near the bodies, which were covered by a tarp, investigators found a trash can containing towels and other cleaning items, all stained with bleach and blood, as well as two .45 caliber casings and a cell phone battery. A warranted search of Crouch's house revealed bullets on the floor and in the wall, a package for a large tarp, a bag containing cell phones with smashed screens and no batteries, and the victims' identification, among other evidence. Security camera video recordings showed Kelly and Beuthin buying a tarp at Walmart on the evening of August 18 and showed Beuthin and Walker buying bleach at Kroger that night. Kelly and Beuthin gave statements, admitting that Crouch had sent them to Walmart to obtain the tarp and disclosing that the weapon used to kill the victims was in Beuthin's bedroom. Kelly informed officers that Crouch told him to kill Miranda. A subsequent ballistics report matched the shell casings found near the bodies with Kelly's gun. An autopsy revealed that Miranda suffered a fatal gunshot to the back of his head as well as a shot to the left side of his chest and that McConnell suffered a fatal gunshot to the right side of his forehead, as well as five additional gunshot wounds.

At trial, Kelly, who had entered guilty pleas to malice murder and concealing the death of the victims, testified as the State's final witness. During the State's direct examination, Kelly testified that, on the day of the killings, Crouch called him and he went to Crouch's house. Kelly testified that he had little memory of conversations he had with Crouch before Miranda and McConnell arrived. He admitted shooting Miranda and McConnell. The prosecutor did not question Kelly about his motive for killing the victims, but he did ask Kelly whether, during an interview after the shooting, he told law enforcement, among other versions of events, that Crouch told him to kill Miranda, and Kelly agreed that he had said that in the interview.[2] During cross-examination, Kelly testified that he did not recall much about his state of mind during that time period and that the shooting was "a blur" that he remembered "vaguely," without "a lot of details about that time," but he claimed sole responsibility for shooting the victims. Asked whether he knew what he was doing at the time of the shooting, Kelly answered, "I knew I was killing them." Counsel asked Kelly whether he knew before he went in Crouch's house

___

[2] The record shows that the detective who interviewed Kelly testified that Kelly confessed to the shooting, but he did not testify regarding Kelly's statement that Crouch told him to kill Miranda.

that he was going to kill the victims — whether there was a plan to kill them — and Kelly answered, "There was something about a plan that I didn't act on." Asked whether he did the shooting "on [his] own" and whether Crouch made him pull the trigger, Kelly responded, "I'm the one who pulled the trigger. . . . Nobody made me pull the trigger." Asked whether McConnell was sitting near Evans, Kelly responded, "I honestly don't remember a whole lot about what happened. I remember I'm in there. All of a sudden start shooting[sic]." Defense counsel asked, "Did Cole Crouch tell you or holler at you or give you a signal or a sign or anything saying, 'shoot the guys?'" Kelly answered, "No." Counsel again asked whether Kelly committed the acts on his own, and he repeated, "I pulled the trigger on my own." Kelly did not agree that he wanted to kill the victims, but when asked, "why shoot seven or eight or nine or ten times if you didn't want to kill them?" Kelly answered, "It seems to me that at the time I felt like I had to." Defense counsel asked Kelly whether he was lying in his statement to the police the day after the shooting that Crouch asked him to kill Miranda. Kelly answered that he could not remember making the statement and that he was not certain whether he told the truth, but he agreed that he lied to the police more than once.

1. Crouch does not challenge the sufficiency of the evidence. Nevertheless, as is our customary practice in murder cases, we have independently reviewed the record and conclude that the evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Crouch was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Crouch contends that evidence of "Kelly's psychotic mental state and delusional thinking at the time of the shootings" was pivotal to his sole defense and that the trial court's exclusion of such evidence deprived him of his rights to due process and a fair trial.

The record shows the following relating to the trial court's evidentiary ruling. During the opening statement for the defense, counsel argued that Crouch did not plan the murders; rather, Kelly took it upon himself to shoot and kill Miranda and McConnell. Counsel posited, "It all gets back to Thomas Kelly as to what possessed him to shoot these two." During cross-examination, after questions regarding the terms of Kelly's guilty plea, defense counsel asked, "At that time [the time of the killings] were you being treated for . . . being a bipolar?" The prosecutor objected, based on relevance. During a bench

9

conference, the following discussion occurred:

> DEFENSE COUNSEL: I would hope that the Court would let me get into the fact that Kelly has made statements to people that the reason why he basically killed these folks was that he didn't like Mexicans, or his grandfather didn't like Mexicans, that he was concerned that the country of Sweden was being taken over by Turks, and that he thought that the Turks were coming in and defiling the culture of Sweden, and that was one of the reasons why he was upset and decided to kill these people.
> COURT: Well, I'm not sure what that has to do with bipolar.
> DEFENSE COUNSEL: Well, I mean he was being treated for being bipolar, ADHD and also depression.
> PROSECUTOR: That has nothing to do with why he shot somebody.
> DEFENSE COUNSEL: And it has everything to do with it.

The trial court then sustained the State's objection, reasoning that, because an insanity or mental illness defense was not being asserted and because "being bipolar" is no defense to murder, Kelly's medical history was irrelevant. The court noted that defense counsel could ask Kelly about his prejudices and biases and whether he killed Miranda and McConnell because of their race. We review the trial court's ruling on the admissibility of this evidence for abuse of discretion. See *Carter v. State*, 302 Ga. 200, 202 (805 SE2d 839) (2017); *Brown v. State*, 285 Ga. 772, 774 (683 SE2d 581) (2009).

Because it was undisputed at trial that Kelly was the shooter, the critical issue as framed by the prosecution was whether Kelly shot the victims with

10

Crouch's involvement as a party to the crime or, as the defense would attempt to show, entirely on his own. See OCGA § 16-2-20. Yet, even assuming that evidence that Kelly was mentally ill was relevant, that is, that the evidence had some tendency to make it more probable that he shot the victims entirely on his own,[3] the excluded evidence of Kelly's "medical history," if introduced, would have been dwarfed by the substantial evidence that Crouch asked Kelly to help him escape his debt by killing Miranda and masterminded a plan for both the crime and the coverup.[4] In addition, as noted above, defense counsel elicited

[3] The Georgia Criminal Code limits the types of and purposes for which evidence of a criminal defendant's mental condition or mental illness may be admitted. In terms of affirmative defenses, evidence of a criminal defendant's mental disability at the time of the alleged offense may be admissible to support the defenses of insanity, under OCGA § 16-3-2, delusional compulsion, under OCGA § 16-3-3, or self-defense based on Battered Person's Syndrome in a murder or manslaughter prosecution, under OCGA § 16-3-21 (d). See *Virger v. State*, 305 Ga. 281, 301 (9) (c) (824 SE2d 346) (2019). In addition to these affirmative defenses, evidence of a defendant's mental disability may be presented to support a claim of incompetency to stand trial, under OCGA § 17-7-130, or a plea of guilty but mentally ill or guilty but with intellectual disability, under OCGA § 17-7-131. See *Virger*, 305 Ga. at 302, n.14. This Court has consistently upheld the exclusion of evidence of a defendant's diminished mental condition when offered to support any mental capacity defense other than the ones currently authorized by statute or to negate the intent element of a crime. See *Virger*, 305 Ga. at 302 (9) (c). Because Kelly, the subject of the mental health evidence at issue, was not a defendant asserting a mental capacity defense on his own behalf, we do not address these limited uses of such evidence.

[4] Indeed, as the trial court noted in denying Crouch's motion for a new trial, evidence that Kelly was mentally ill and suffering from delusional thinking arguably could have been damaging to Crouch, as supporting an inference that Kelly's mental health issues and disordered thinking made him more susceptible of Crouch's influence or manipulation.

11

multiple statements from Kelly on cross-examination in which he claimed sole responsibility for shooting the victims. Hence, we conclude that it is highly probable any error in the trial court's evidentiary ruling did not contribute to the jury's verdicts. Such an error is therefore harmless and does not require a new trial. *Smith v. State*, 299 Ga. 424, 432 (2) (d) (788 SE2d 433) (2016) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (citation, punctuation, and footnote omitted)).

3. In a related claim of error, Crouch contends that his trial counsel was ineffective in failing to develop and adduce evidence necessary to support his sole defense, that is, that Kelly acted alone and without Crouch's request or encouragement when he shot Miranda and McConnell. To prevail on this claim, Crouch must show that the performance of his counsel was professionally deficient and that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been more favorable to him. See *Strickland v. Washington*, 466 U. S. 668, 687-695 (III) (104 SCt 2052, 80 LE2d 674) (1984). We need not review both elements of this test if the appellant fails to prove one of them. See *Matthews v. State*, 301 Ga. 286, 288 (800 SE2d 533)

(2017).

Crouch contends that, to support his defense that Kelly acted alone, he needed to provide an alternative explanation to the State's theory as to why Kelly shot Miranda and McConnell. That alternative explanation was that Kelly decided on his own to shoot Miranda (and McConnell as well, after Miranda arrived accompanied by McConnell), because he had serious mental health problems[5] and delusional thinking[6] at the time of the shootings that caused him

_____

[5] At the hearing on his motion for a new trial, Crouch introduced copies of a report by Thomas H. Sachy, M.D., who evaluated Kelly in March 2014 regarding his competency to stand trial, and two reports by Darcy L. Shores, Ph.D., Psy.D., who evaluated Kelly in November 2014 regarding his competency to stand trial and his degree of criminal responsibility. Crouch contends that these reports, and other evidence, were available to defense counsel and could have been used to show that Kelly had a lesion on his brain that caused him to be impulsive and aggressive; that he had been diagnosed with bipolar depression and other mental disorders; that just one week before the shooting his psychotropic medications had been changed and he may not have been taking them as prescribed; that, around the time of his arrest, he had been drinking heavily, using marijuana daily, and using cocaine at least twice a week. Furthermore, Crouch contends that evidence was available to show that Kelly had an obsessive fear of going to hell for committing blasphemy and heard voices telling him this and that he had never recovered from his father's suicide and carried as his comfort object the handgun his father had used to kill himself.

[6] To support his argument regarding the availability to his trial counsel of evidence of Kelly's delusional thinking, Crouch relies primarily on the reports of Drs. Sachy and Shores. For example, Dr. Sachy's report stated that,

> according to Mr. Kelley [sic], several weeks before the incident, he became preoccupied with the threat of Turks moving into Sweden. This was because he had seen a [rap music] video of a Muslim man having sex with a Christian woman on the Internet. He believed that this represented a threat to the Caucasian race in America. He believed that the video was slandering God. The fact that a Turk was having sex with a Swedish woman and "rapping"

13

to believe that he had to kill Miranda to protect Crouch and Crouch's family from being defiled and killed by Miranda. Crouch contends that his trial counsel failed to thoroughly investigate Kelly's mental health history and failed to have witnesses and other evidence of these issues available for trial and, therefore, was unprepared to present evidence that Kelly needed no request or encouragement to shoot Miranda and McConnell because of his mental health issues and racial biases. Crouch contends that, building on these failures, defense counsel failed to fully apprise the trial court of the relevance of the evidence of Kelly's medical history and its necessity for Crouch's sole defense, resulting in the court's ruling that such evidence was irrelevant. Crouch also

> about it was an affront to his grandfather's memory, the Viking Gods, Swedish culture, and his own Scottish/Norman ancestors. All of this made him very upset. . . . He began to feel like he had a divine call to go to Sweden. He felt that he had to deal with the problems like the Vikings of old did, with self assured violence and aggression. . . . Kelly also believed that the victims were somehow part of a Muslim horde that was threatening his Viking heritage, the memory of his grandfather, and the honor of non Muslim women in America and Sweden.

Similarly, in Dr. Shores's report, he stated that Kelly reported being "concerned" about "all of the Turks coming into Sweden" and that he "saw a connection between the Turks invading Sweden" and "trying to displace Swedish culture with their own culture" and "the Mexicans coming into the United States" and "trying to replace European American culture with their own culture." In addition, Crouch points to Kelly's recorded interrogation, where he told authorities that he had been taken advantage of by "a black drug dealer," who stole money and guns from him, and that he saw a link between what had happened to him and Miranda's threats to Crouch. In Dr. Shores's report, he recorded that Kelly "felt like he was getting back at a black male that used to steal from him."

14

contends that, even with the trial court's broad ruling excluding evidence of Kelly's medical history, his trial counsel could have adduced evidence of Kelly's state of mind at the time of the shootings by confronting him with various pretrial statements relevant to his biases against Mexicans, African Americans, and drug dealers, by cross-examining him regarding his pretrial statement that Crouch was upset that he shot the victims, and by cross-examining Beuthin regarding her pretrial statement that Kelly had anger issues and was "easy to rile up."

Contrary to Crouch's assertion that his trial counsel failed to thoroughly investigate Kelly's mental health history, Crouch's defense counsel testified at the hearing on the motion for a new trial that he had reviewed Kelly's voluminous mental health records and considered Kelly's significant mental health history relevant to the defense's theory that Kelly committed the murders without Crouch's involvement. It was his intention to "go as far as the Court would allow" in introducing information about Kelly's mental health background during his cross-examination of Kelly. He believed that the reports prepared by the clinical psychologist who examined Kelly "would have helped the State considerably," and he saw no need to call her as a witness if the State

15

did not. Although he expected to offer more evidence than the trial court's decision to sustain the State's objection to evidence of Kelly's medical history allowed, counsel testified, "you get what you can get from a witness and move on. I wasn't going to do anything I thought would hurt [Crouch's] case at all, and I just made the decision then that we had to move on and see if I could cross-examine other witnesses and also have strong testimony from [Crouch]." Although trial counsel testified that, at the time of the hearing on the motion for new trial, he could not think of any strategic reason for several of the choices he made in connection with the presentation of the evidence, he testified that his decision, at the time of the court's evidentiary ruling, not to make a proffer to the trial court of Kelly's lengthy mental health history was "a matter of trial strategy." He testified that, in hindsight, he "should have developed quite a bit more" evidence of Kelly's mental health history. But he testified that he felt that, with a good cross-examination of Kelly, and with a good direct examination of Crouch, the defense could inform the issue that the jury needed to decide. The trial transcript shows that, although trial counsel's plan was somewhat frustrated by the trial court's evidentiary ruling, counsel's cross-examination of Kelly elicited testimony very favorable to Crouch's defense. Kelly denied any memory

16

of Crouch suggesting in any way that he kill the victims; the single reference to that in Kelly's testimony came during the State's direct examination, when Kelly acknowledged saying so in his initial police interview. Kelly claimed sole responsibility for the shooting and repeatedly stated that he acted on his own and not as part of a plan. This favorable testimony could have been compromised if counsel had admitted the reports of the psychiatrist and clinical psychologist who concluded that Kelly was competent to stand trial, especially because those reports also memorialized repeated statements by Kelly that Crouch told him to kill the victims.

It is well settled that "hindsight has no place in an assessment of the performance of trial counsel, and a lawyer second-guessing his own performance with the benefit of hindsight has no significance for an ineffective assistance of counsel claim." *Keener v. State*, 301 Ga. 848, 850 (2) (804 SE2d 383) (2017) (citation and punctuation omitted). Rather, trial counsel's performance is judged according to an objective standard of reasonableness, considering all the circumstances from counsel's perspective at the time of the challenged conduct, and in the light of prevailing professional norms. *State v. Mobley*, 296 Ga. 876 (770 SE2d 1) (2015); *Brown v. State*, 288 Ga. 902, 907 (5)

17

(708 SE2d 294) (2011). "In reviewing counsel's performance, we must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Keener v. State*, 301 Ga. at 850 (2) (citation and punctuation omitted). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Martin v. Barrett*, 279 Ga. 593 (619 SE2d 656) (2005) (citation and punctuation omitted). "Accordingly, a tactical decision will not form the basis for an ineffective assistance of counsel claim unless it was so patently unreasonable that no competent attorney would have chosen it." *Keener v. State*, 301 Ga. at 850 (2) (citation and punctuation omitted).

In this case, the record shows that counsel thoroughly investigated the law and facts relevant to plausible options and that the complained of acts and omissions reflected strategic choices. Considering all the circumstances from counsel's perspective at the time of the challenged conduct, and in the light of prevailing professional norms, we conclude that Crouch has not carried his burden of showing that no competent attorney would have made the tactical decisions his counsel made to elicit what evidence the trial court would allow of mental health history but not to introduce evaluation reports or testimony that

would include information damaging to the defense. *Barrett v. State*, 292 Ga. 160, 181 (3) (C) (6) (733 SE2d 304) (2012); *Ferrell v. State*, 261 Ga. 115, 120 (3) (401 SE2d 741) (1991). Because Crouch failed to show deficient performance, his claim that he was denied the effective assistance of counsel fails on that basis alone, and the trial court did not err in denying his motion for a new trial.

Judgment affirmed. All the Justices concur.

Decided March 4, 2019.

Murder. Houston Superior Court. Before Judge Adams.

Hogue, Hogue, Fitzgerald & Griffin, Laura D. Hogue, Susan D. Raymond, for appellant.

George H. Hartwig III, District Attorney, Daniel P. Bibler, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General, for appellee.