312 Ga. 606
FINAL COPY

S21A0970.  HUGHS v. THE STATE.

COLVIN, Justice.

Following a jury trial, Jerome Edward Hughs was convicted of felony murder in connection with the death of Kaidence Alexander, an 18-month-old child.[1]  Hughs claims that the evidence presented at his trial was insufficient to support his conviction, that he was denied constitutionally effective assistance of counsel, and that the trial court erred when it gave a so-called "*Allen* charge" during jury

---

[1] On December 10, 2013, a Richmond County grand jury indicted Hughs for malice murder and felony murder predicated on cruelty to children in the second degree.  At a jury trial held from June 22 through 25, 2015, Hughs was acquitted of malice murder and found guilty of felony murder; he was subsequently sentenced to life in prison without the possibility of parole.  Hughs filed a motion for new trial on July 15, 2015.  After a hearing, the trial court denied the motion on November 29, 2016, and Hughs appealed to this Court.  However, prior to the docketing of the appeal, trial counsel withdrew from the case, and a new attorney was appointed to represent Hughs.  New counsel then filed a motion to remand Hughs's case in order to raise claims of ineffective assistance of trial counsel, and this Court granted the motion.

Upon remand, new counsel filed another motion for new trial on July 11, 2019, raising claims of ineffective assistance of counsel.  New counsel amended the motion on August 15, August 26, and August 31, 2019.  After a series of hearings, the trial court denied the motion as amended on February 9, 2021.  Hughs timely filed a notice of appeal.  The appeal was docketed to the August 2021 term of this Court and submitted for a decision on the briefs.

deliberations. For the reasons set forth below, we affirm.

1. Hughs contends that the evidence presented at trial was constitutionally insufficient to sustain his murder conviction. He also argues that the evidence of his guilt was insufficient as a matter of Georgia statutory law, see OCGA § 24-14-6, because the State's case was based solely on circumstantial evidence and did not exclude the reasonable hypotheses that someone or something else caused Kaidence's death. We address each claim in turn.

(a) Hughs claims that the evidence was legally insufficient to support his conviction for felony murder predicated on cruelty to children in the second degree because the State failed to establish every element of the crime charged. We disagree. When evaluating the sufficiency of evidence as a matter of constitutional due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "This Court

2

does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013).

Viewed in this light, the evidence presented at trial showed that, in the summer of 2012, Jasmine Fobb surrendered guardianship of her two small children (Kaidence and her sister) to Danielle and Jerome Hughs, Fobb's sister and brother-in-law.[2] In the months leading up to Kaidence's death, Fobb and the children's biological father, Patrick Alexander, remained in contact with their children. On February 14, 2013, Fobb and Alexander traveled to Augusta to see their children, and they stayed with the Hughs family during their visit.

On the afternoon of February 20, 2013, emergency services were dispatched to the Hughses' home in Richmond County in

---

[2] The Hughses had eight children of their own, ranging in age from one to fourteen years.

response to a call concerning an unresponsive 18-month-old child. Emergency personnel entered the home and found Kaidence lying motionless and supine on an ottoman. While there were no obvious outward signs of trauma or injury, the child was not breathing and had no pulse. They placed Kaidence in an ambulance, administered CPR, and were able to regain a pulse about eight to ten minutes before they arrived at the hospital. Kaidence was then intubated, placed on mechanical ventilator support, and admitted to the pediatric intensive care unit ("PICU"). Upon her initial examination, Dr. Remuka Mehta, Kaidence's treating physician, observed fingertip shaped bruises on Kaidence's chest and reported suspected child abuse to child services.

While in the PICU, Kaidence remained unresponsive, and her brain function stopped. The child's brain had swollen so much that it could no longer be contained by her skull, and CT scans showed chronic subdural bleeding and fluid collected in the area around the bleed. Based upon this, Dr. Mehta concluded that an acute illness or injury had occurred shortly before Kaidence's arrival at the

4

hospital.  Dr. Mehta also noted that Kaidence had numerous fractured ribs in various stages of healing, and ruled out CPR as a cause based upon the posterior location of the rib fractures.

Kaidence was officially pronounced dead on February 27, 2013. Dr. Lora Darrisaw performed the autopsy and located 14 rib fractures in different stages of healing, ranging from one to 21 days old.  Kaidence also had a new injury to the tip of her tongue that had necrotized[3] due to insufficient oxygen and blood flow.  Dr. Darrisaw noted that the child had bitten her tongue so hard it nearly severed the tip from the rest of the organ and opined that the tongue injury was caused by an intentional and forceful manual compression of Kaidence's mouth.  Dr. Darrisaw further noted several impact sites to the child's skull, which caused hemorrhaging and swelling in the brain.  Dr. Darrisaw opined that the cause and manner of Kaidence's death was homicide by manual asphyxia with inflicted head trauma causing cerebral edema.

---

[3] Dr. Darrisaw testified at trial that necrotic tissue is dead or dying tissue.

Officers spoke with Fobb and Alexander, who were in the home on the date of the incident.[4] Officers learned that, on the morning of February 20, Kaidence had been acting fussy and complaining about trouble with her ear. Alexander was watching television on the sofa in the living room, and Fobb was in the kitchen, preparing some juice for the children, when Hughs came into the kitchen and asked why Kaidence was upset. Fobb stated that she did not know, explained that the child was probably just being whiny, and noted that she had just checked Kaidence's diaper. Hughs then turned to Kaidence and said, "Girl, come on," and Kaidence followed Hughs into his bedroom.

Approximately two minutes later, Hughs summoned Fobb into the bedroom. When Fobb entered the room, Kaidence was lying at the foot of the bed, seemingly asleep. Hughs showed Fobb that the child had a dirty diaper and posited that that was why she had been fussy. Hughs then lifted the child from the bed and handed her to

---

[4] Seven of the Hughses' eight children were also at the house on February 20. However, none of their statements were admitted at trial as defense counsel successfully challenged the admissibility of their statements pre-trial.

Fobb, who noticed that the child felt heavy. Fobb attempted to get a response from the child by tapping her leg, suctioning mucus from her nose, and splashing her with water, but Kaidence remained unresponsive. Upon noticing that the child was not breathing, Alexander called 911, and he and Fobb moved the child to the ottoman in the living room to provide CPR until emergency services arrived.

Officers also interviewed Hughs about the day of the incident. He denied harming the child in any way and accused Fobb and Alexander of abusing Kaidence on prior occasions. Still, Hughs admitted to disciplining Kaidence's older sister with a belt. Hughs told officers that, on the day of the incident, he was awakened by the sound of Kaidence crying. When he went to see what the issue was, he found Fobb holding the crying child. He reprimanded Fobb for constantly picking up Kaidence and told Fobb to put Kaidence down. Thereafter, Hughs stated that Kaidence followed him into his bedroom, at which point he discovered that the child was wearing a dirty diaper. He admitted to being alone with the child before

7

summoning Fobb into the room to show her Kaidence's diaper. Hughs told officers that, when Fobb entered the bedroom, Kaidence was already lying on Hughs's bed, seemingly asleep, and that is when Fobb noticed that the child was unresponsive.

Although the evidence did not show exactly how Kaidence's fatal injuries were inflicted, Hughs admitted that he escorted a walking, talking Kaidence into his bedroom and that he was alone with her prior to the child being found limp and unresponsive. Moreover, the medical experts testified at trial to seeing numerous signs of abuse — i.e., rib fractures in various stages of healing and fingerprint marks to Kaidence's chest — and that Kaidence's head and mouth injuries were inflicted a short time prior to her arrival at the emergency room for treatment. Based on the foregoing, a rational jury could conclude that Hughs, acting with criminal negligence, caused Kaidence, an 18-month-old child, cruel or excessive physical or mental pain that led to her death. See OCGA § 16-5-1 (c) (felony murder occurs when a person "causes the death of another human being irrespective of malice" during the

8

commission of a felony); OCGA § 16-5-70 (c) ("Any person commits the offense of cruelty to children in the second degree when such person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain.").  Accordingly, the jury was authorized to find Hughs guilty beyond a reasonable doubt of felony murder predicated on cruelty to children in the second degree. See *Jackson*, 443 U. S. at 319 (III) (B).

(b) Hughs also claims that, as a matter of Georgia statutory law, the evidence presented at trial was insufficient to sustain his conviction because the evidence of his guilt was entirely circumstantial and did not exclude other, reasonable hypotheses. Under OCGA § 24-14-6,

> in order to convict [Hughs] of the crimes based solely upon circumstantial evidence, the proven facts had to be consistent with the hypothesis of [his] guilt and exclude every reasonable hypothesis save that of [his] guilt. Not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable.

(Citation and punctuation omitted.) *Cochran v. State*, 305 Ga. 827, 829 (1) (828 SE2d 338) (2019).  Whether the evidence excludes every

9

other reasonable hypothesis is a question for the jury, see *Collett v. State*, 305 Ga. 853, 855-856 (1) (828 SE2d 362) (2019), and that finding will not be disturbed on appeal unless the verdict is insupportable as a matter of law, see *Akhimie v. State*, 297 Ga. 801, 804 (1) (777 SE2d 683) (2015).

Hughs claims that the evidence did not exclude the reasonable hypotheses that someone else in the home committed an act upon Kaidence that caused her to stop breathing or the possibility that Kaidence's death was the result of unexplained or natural causes. Viewing the evidence as a whole, and as discussed at length above, the evidence was sufficient to enable the jury to reject as unreasonable the hypotheses that someone else caused Kaidence's injuries and that Kaidence died as a result of unexplained or natural causes. See *Long v. State*, 309 Ga. 721, 726-727 (1) (b) (848 SE2d 91) (2020) (in context of claim raised pursuant to OCGA § 24-14-6, "[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence" (citation and punctuation omitted)); *Debelbot v. State*, 305 Ga. 534

10

(1) (826 SE2d 129) (2019) (circumstantial evidence was sufficient to support malice murder convictions where evidence showed that the child was healthy when she left the hospital following her birth, her injuries were non-accidental, and she was in the sole care of the defendants when her injuries occurred).

2.   Hughs alleges that he received ineffective assistance of trial counsel based upon counsel's failure to retain and call an expert witness to challenge the medical testimony presented by the State. In order to establish constitutionally ineffective assistance, a defendant must show that his counsel's performance was professionally deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been different.  See *Strickland v. Washington*, 466 U. S. 668 (III) (104 SCt 2052, 80 LE2d 674) (1984).  If the defendant fails to satisfy either prong of the *Strickland* test, this Court is not required to examine the other.  See *Green v. State*, 291 Ga. 579, 580 (2) (731 SE2d 359) (2012).

Trial counsel testified at the hearing on Hughs's amended

11

motion for new trial that he received and reviewed all of the discovery material, which included hours of taped interviews, Kaidence's medical records (including records from prior doctor visits), and the autopsy report and photos. Counsel also interviewed Dr. Darrisaw prior to trial and attempted to interview Dr. Mehta but was unable to reach her. Counsel explained the defense theory as follows:

> The defense was that we had a situation where Mr. Hughs would have been accused of just walking back into a room with a young child and basically committing murder, whether it was malice murder or felony murder. And so, what we wanted to show was that there were different problems and issues with the State's case dealing number one with why would he do that? That was obvious. And then, secondly also with different issues surrounding the child herself that had come up before. Some health issues to some extent. We weren't going to go extensively into those, but we basically were trying to establish that this was not a murder case. The case was only going to deal with, he probably was alone with the child maybe two minutes, if that long. And so, what we wanted to do was, kind of, establish that in that time, period of time, he would not have been able to do what they were alleging that he did with approximately ten people in the house.

> Counsel testified that his strategy at trial was to elicit

12

testimony on cross-examination from the State's medical experts and the emergency personnel who responded to the scene that Kaidence's injuries were inconsistent with abuse. Specifically, trial counsel sought to establish, through cross-examination, that a number of pre-existing health issues could have caused Kaidence's older injuries and that her newer injuries were consistent with the life-saving measures attempted on February 20.[5] In preparation for his cross-examination of these witnesses, counsel consulted with a nurse practitioner who "help[ed] with medical records and also potentially cause of death." Trial counsel testified that, based upon the defense's theory of the case, calling a defense expert at trial could have been problematic because, while an expert might have helped to "muddy the waters," he was concerned that a competing expert would have to make concessions that directly contradicted the defense's theory of the case.

Hughs also called Dr. Ronald Wright, a forensic pathologist, at the motion for new trial hearing. Dr. Wright opined that Kaidence's

---

[5] The record shows that trial counsel implemented this strategy at trial.

death was the result of an epileptic seizure. However, on cross-examination, Dr. Wright conceded that, prior to her death, Kaidence showed none of the signs that a patient suffering from a seizure would have normally displayed, such as shaking, making "gurgly" sounds, and rhythmic limb movements. He further conceded that tongue bites during seizures were generally far more minor than the injury seen on Kaidence's tongue, that the manner of death in this case could still be a homicide even if it arose out of a seizure, that Kaidence's rib injuries were caused by abuse, and that Kaidence was "an abused child."

Hughs argues that trial counsel's decision not to retain or present testimony from a competing medical expert was deficient performance. However, "[t]he decision whether to call an expert witness is a matter of trial strategy within the broad range of professional conduct afforded trial attorneys." *Davis v. State*, 290 Ga. 584, 586 (2) (a) (723 SE2d 431) (2012). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of

reasonable professional assistance." (Citation omitted.) *Harrington v. Richter*, 562 U. S. 86, 104 (IV) (131 SCt 770, 178 LE2d 624) (2011). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. . . . The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Id. at 105 (IV) (quoting *Strickland*, 466 U. S. at 690); see also *Crouch v. State*, 305 Ga. 391, 400 (3) (825 SE2d 199) (2019) ("[T]rial counsel's performance is judged according to an objective standard of reasonableness, considering all the circumstances from counsel's perspective at the time of the challenged conduct, and in the light of prevailing professional norms.").[6] Therefore, "a tactical decision will not form the basis for an ineffective assistance of counsel claim unless it was so patently unreasonable that no competent attorney would have

---

[6] Though the trial court, in denying the motion for new trial, determined that trial counsel was not deficient for other reasons, in reviewing that decision, "we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

15

chosen it." (Citation and punctuation omitted.) *Brown v. State*, 288 Ga. 902, 909 (5) (708 SE2d 294) (2011).

Here, the record shows that counsel thoroughly investigated and prepared for the medical evidence in this case. The record further shows that, based upon this investigation, counsel made a reasonable strategic decision to attack the State's medical evidence through a thorough and sifting cross-examination of the State's witnesses, rather than to present the testimony of a competing medical expert who would have conceded important factual issues harmful to the defense's theory of the case. Considering all of the circumstances from counsel's perspective, and in the light of prevailing professional norms, we conclude that Hughs has failed to show that trial counsel's tactical decision was so unreasonable that no competent attorney would have chosen it. See *Guzman-Perez v. State*, 310 Ga. 573 (2) (853 SE2d 76) (2020) (no deficient performance where counsel made a strategic decision to elicit medical evidence through a thorough cross-examination of the State's expert rather than retain a competing defense expert). Consequently, Hughs has

16

failed to carry his burden under *Strickland*, and the trial court did not err in denying his motion for new trial.

3. Finally, Hughs claims that the trial court abused its discretion by giving the jury a modified "*Allen* charge"[7] during deliberations. The record shows that the jury began its deliberations on June 24, 2015, at 3:45 p.m. and that the jurors were sent home at 6:00 that evening after requesting to be released for the night. The jury returned at 10:00 the next morning and continued deliberating. That morning, the jury was allowed to review a portion of Hughs's video-recorded statement in the courtroom. Then, at 11:35 a.m., the jury foreman sent a note to the trial court stating, "Judge, we have no way of coming to an agreement. At this time we are 11 to 1 and the one person does not want to have any further discussions." The trial court then discussed the option of giving an *Allen* charge with the parties. Defense counsel objected, arguing that the trial court "should just inquire would any more deliberation

---

[7] See *Allen v. United States*, 164 U. S. 492 (17 SCt 154, 41 LE 528) (1896).

17

help them before actually giving that particular *Allen* charge." The trial court disagreed and gave the Georgia pattern modified *Allen* charge. See Ga. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.70.70 (4th ed. 2007) (Jury (Hung)).[8] The jury returned to deliberate at 11:45 a.m. and arrived at a verdict at 1:05 p.m.

Hughs argues that the modified *Allen* charge was unduly coercive, not because it was legally inaccurate, but because the jury had not spent enough time deliberating prior to the trial court giving the charge. "The decision of whether to give an *Allen* charge is within the discretion of the trial court," *Mayfield v. State*, 276 Ga. 324, 330 (2) (b) (578 SE2d 438) (2003), and a trial court's instruction is not "coercive simply because [the instruction] compelled the jury to continue deliberating after it reported a deadlock." *Porras v. State*, 295 Ga. 412, 420 (3) (761 SE2d 6) (2014). Instead, "[t]he issue in reviewing (an *Allen*) charge is whether the instruction is coercive

    [8] The instruction in this case was the new pattern instruction that did not include the "must be decided language" that this Court previously disapproved in *Burchette v. State*, 278 Ga. 1 (596 SE2d 162) (2004).

18

so as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." (Citation and punctuation omitted.) *Lowery v. State*, 282 Ga. 68, 71 (4) (a) (646 SE2d 67) (2007).

Here, the modified *Allen* charge read by the trial court was an accurate statement of the law and not coercive. See *Smith v. State*, 302 Ga. 717, 722 (2) (808 SE2d 661) (2017) (approving of the pattern modified *Allen* charge as "fair and accurate"). Still, Hughs argues that the amount of time the jury deliberated before and after the modified *Allen* charge was given is enough to demonstrate coercion. While "[c]ontextual factors, like timing, may play a role in determining coerciveness where there is a possibility that the charge could be coercive . . . , the length of deliberations alone cannot render a non-coercive charge coercive." (Citation and punctuation omitted.) *Scott v. State*, 290 Ga. 883, 888 (6) (725 SE2d 305) (2012). Because Hughs has not shown that the modified *Allen* charge was even potentially coercive, he cannot show that the trial court abused its discretion by giving the *Allen* charge during jury deliberations. See

id.

*Judgment affirmed. All the Justices concur.*

Decided October 5, 2021.

Murder. Richmond Superior Court. Before Judge Flythe.

*Lyndsey A. Hix*, for appellant.

*Jared T. Williams, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.