**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BROWN and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

June 23, 2023

# In the Court of Appeals of Georgia

A23A0517. MELANCON v. THE STATE.

MCFADDEN, Presiding Judge.

After a jury trial, Sidrick Raymone Melancon, Sr. was convicted of second-degree murder, second-degree child cruelty, and influencing witnesses in connection with the death of his infant daughter, Laura Higgenbotham, at the hand of the girl's mother, Sadai Higgenbotham. On appeal, he argues there was insufficient evidence to convict him of second-degree murder and second-degree child cruelty in the manner charged in the indictment; but the evidence authorized the jury to find him guilty of those crimes as charged. Melancon argues that there was a fatal variance because the state argued in closing that he committed second-degree murder and second-degree child cruelty in a way not charged in the indictment; but the evidence of those crimes was sufficient and Melancon waived any challenge he might have to

the state's closing argument by failing to object to it at trial. Finally, Melancon argues that he received ineffective assistance of trial counsel because his trial counsel did not properly object to a detective's testimony about battered person syndrome; but he has not shown that his trial counsel's performance was deficient. So we affirm.

1. *Sufficiency of the evidence.*

In two related enumerations of error, Melancon argues that the evidence did not authorize the jury to find that he committed the offenses of second-degree murder and second-degree child cruelty. He specifically challenges the evidence of causation, which is an element of both offenses.

"A person commits the offense of murder in the second degree when, in the commission of cruelty to children in the second degree, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (d). "[A] person commits the offense of cruelty to children in the second degree when such person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (c). "Criminal negligence is an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." OCGA § 16-2-1 (b).

2

With these principles in mind, we turn to the trial evidence, considering "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted). "This [c]ourt does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Hughs v. State*, 312 Ga. 606, 607 (1) (a) (864 SE2d 59) (2021) (citation and punctuation omitted).

So viewed, the evidence showed that nine-month old Laura died on August 7, 2017 of massive head trauma. At that time, Laura was living in a household with her father, the defendant Sidrick Melancon; her mother, co-indictee Sadai Higgenbotham;[1] Melancon's girlfriend, Gerallyn Long; and Melancon's and Long's three young children. Within this household, Melancon exerted significant control over the activities and movements of Long and Higgenbotham. For example, he forbade the two women from interacting with each other within their shared apartment. He did not allow them to move around the apartment or leave their

---

[1] The cases were severed for trial.

3

bedrooms without his permission, even to use the bathroom. Melancon also physically abused both women.

Higgenbotham and Laura had lived in this household off and on since March 2017. When Higgenbotham first joined the household, her mother warned Melancon not to leave Laura alone with her. Melancon and Long both believed Higgenbotham was a poor mother and was abusing Laura. Long testified at trial about numerous occasions of abuse: at least once a week she heard thumps followed by crying emanating from the room Higgenbotham and Laura shared and on at least one occasion she heard Higgenbotham slap Laura; Higgenbotham would force feed Laura until she gagged and muffle Laura's mouth with her hand when the baby cried; and Higgenbotham once went to work leaving Laura alone in a hot room. Melancon knew about some of these incidents. He admitted at trial that he knew Higgenbotham would do things like wrench Laura's mouth open to feed her, keep Laura in temperatures that were too hot, get angry and frustrated at Laura, and hold her hand over Laura's mouth to keep her from crying.

At Melancon's instruction, Long often provided care for the baby. On June 13, 2017, less than two months before Laura's death, Long saw a bruise and fingernail mark on her face that Long believed were from abuse. Long showed Melancon a

photograph of those injuries; he agreed that the injuries were not accidental and accused Higgenbotham of abusing Laura. Long asked Melancon for permission to report the abuse to the Department of Family and Children Services ("DFCS"). Melancon initially agreed, and Long contacted DFCS. At that time, however, Long did not provide DFCS with her name or with accurate information from which DFCS could locate Higgenbotham.

The next day Melancon changed his mind and instructed Long not to cooperate with DFCS. Long followed Melancon's instructions and, in her words, "ghost[ed]" DFCS. She testified that she would have cooperated with DFCS had Melancon not instructed her against doing so.

So although DFCS attempted to investigate Long's initial report, its investigator was unable to locate Higgenbotham or Laura. The investigator went to the address that Long had given for Higgenbotham but was not able to find anyone there. Based on information in Long's report that Higgenbotham and Laura were at an extended-stay motel, he also went to several such motels in the area to try to find them, again with no success. He attempted to reach Higgenbotham at a phone number listed in Long's report, but that number was no longer in service. He also tried, without success, to find Higgenbotham on social media.

The investigator tried several times to speak to Long on the phone, at the number she had provided in her report, but at first she did not answer his calls and voice mail was not available. He sent Long a text message asking her to contact him as soon as possible so that he could "help with the family," but Long did not respond. Finally, the investigator was able to reach Long on the phone. She refused to provide her name to him. The investigator asked Long if she knew where Higgenbotham and Laura were living and she said she did not. Long then hung up on the investigator. He immediately called her again but she did not answer. He called another time within the minute, and when Long answered the investigator told her that it was "imperative that she provide [him] with any information that she had that would help [him] locate the family." Long responded: "I do not know where they are. I don't have the number for them, and you can cancel the report." She then hung up on the investigator.

Notwithstanding Long's lack of cooperation, the investigator continued his efforts, described above, to search for Higgenbotham and Laura. He also tried to contact Long by phone another time, but she did not answer.

DFCS did not "cancel" the report, as Long had requested. But because DFCS was unable to locate Higgenbotham or Laura despite the investigator's efforts, it ultimately closed the case.

6

Higgenbotham continued to abuse Laura. On August 3, 2017, four days before Laura's death, Long saw several new injuries on the baby that appeared to be from abuse.

The next day, August 4, 2017, Long cared for Laura while Higgenbotham worked an evening shift. When Melancon brought Laura to Long that evening, the baby appeared healthy. Shortly after midnight on August 5, Higgenbotham returned home from work and Melancon retrieved Laura from Long's bedroom and took her to Higgenbotham. Later that morning, Melancon went to work. Higgenbotham contacted Melancon around 12:45 pm and told him that she could not wake up Laura. She contacted Melancon again that afternoon, told him that the baby had a fever, and asked permission to stay home from work. Melancon told Higgenbotham to go to work and that he would take Laura to urgent care later if necessary.

Higgenbotham went to work, leaving Laura alone in a car seat in her bedroom. Melancon returned from work at around 4:00 pm, picked up Laura in her car seat, took her to Long's bedroom, told Long to look after her, and then left the apartment.

Long immediately realized that something was seriously wrong with Laura. The baby, who was strapped tightly into the car seat, was unconscious and appeared lifeless. She had a very fast heartbeat and her breathing was extremely labored. One

of her eyes was shut tight with a constricted pupil and the other was wide open with a dilated pupil. Her mouth was full of blood. Long attempted CPR on Laura, with no response.

Long contacted Melancon and told him she was going to call an ambulance. Melancon instructed Long not to do so, telling her that he would return to the apartment instead because he was still in the neighborhood. When he arrived at the apartment, Laura was lying on the floor, purple and immobile.

Melancon drove Long and Laura to a nearby urgent care clinic, arriving there sometime after 5:00 pm. He entered the clinic, dropped the car seat containing Laura on the floor, and demanded help. At that point Laura was not breathing, her skin was gray, and she was cold and nonresponsive. Her poor condition was immediately apparent to an onlooker.

Medical personnel at the clinic attempted to resuscitate Laura. A registered nurse instructed another clinic employee to call 911 and Melancon yelled, "no!" The nurse looked at Melancon and repeated the instruction, then medical personnel took Laura into another room, accompanied by Long. Once they left the waiting room, Melancon's demeanor immediately changed from frantic to calm and he quickly left the clinic.

A police officer responded to the 911 call and spoke with Long, telling her to remain at the clinic. But Long returned to the waiting room and a few minutes later Melancon drove up, Long got into his vehicle, and they drove away. Later that evening Melancon instructed both Long and Higgenbotham to lie to law enforcement officers about matters such as their living arrangement and Higgenbotham's prior abuse of Laura. Melancon also accused Higgenbotham of injuring Laura by shaking her.

Laura was first transported by ambulance to a local hospital and then by helicopter to the pediatric intensive care unit of a children's hospital. Her condition was critical. She had been resuscitated following cardiac arrest. She was unresponsive, had acute blood loss, required medication to keep her heart pumping effectively, and required assistance to breathe. She appeared to have been without adequate oxygenation for an extensive period of time. She had blunt force injuries all over her body that were in various stages of healing. She had brain injuries that reflected massive trauma, including brain bleed and retinal hemorrhage. She also had spinal injuries and leg fractures, including some older fractures that were partially healed. The nature and location of her injuries indicated that they were not accidental but had been intentionally inflicted. There were indications that she had been in

9

distress for several hours before she arrived at the urgent care clinic. Laura's condition never stabilized and she died on August 7, 2017.

Melancon argues that this evidence was insufficient to show the element of causation required to convict him of either second-degree murder or second-degree child cruelty. To support a conviction for second-degree murder based on second-degree child cruelty, the evidence must show that Melancon caused cruel or excessive pain to Laura in the manner alleged in the indictment. *Bell v. State*, 362 Ga. App. 687, 700 (1) (870 SE2d 20) (2022). It is not enough for the state to show that he merely neglected Laura or permitted her to remain in an unhealthy or dangerous environment. See id. at 702 (1).

The state's indictment of Melancon alleged that he caused Laura's death by committing the offense of second-degree cruelty to children in three ways: (1) "by causing Gerallyn Long to not cooperate with a Division of Family and Children Services investigation into the abuse of Laura Higgenbotham"; (2) "by failing to seek adequate and necessary medical attention for said child's injuries"; and (3) "by leaving the child alone with Sadai Higgenbotham knowing that Sadai Higgenbotham was abusive toward the child[.]" As detailed below, we conclude that the evidence authorized the jury to find that Melancon caused Long not to cooperate with the June

10

2017 DFCS investigation and that this action was a proximate cause of cruel and excessive pain that Laura experienced and that ultimately led to her death. So we do not address Melancon's arguments regarding the other methods of committing the crimes charged in the indictment.[2] See *Murden v. State*, 258 Ga. App. 585, 586 (1) (574 SE2d 657) (2002) ("despite the fact that the indictment was formed in the conjunctive, proof that (the defendant) committed the crime by any of the methods charged would form a basis for upholding his conviction") (citations and punctuation omitted). See also *Lubiano v. State*, 192 Ga. App. 272, 273-274 (1) (a) (384 SE2d 410) (1989).

The offenses of second-degree murder and second-degree child cruelty require a showing of proximate cause. See generally *State v. Jackson*, 287 Ga. 646, 648-651 (2) (697 SE2d 757) (2010) (unless another meaning is indicated, the term "cause" is interpreted to mean "proximate cause"). Proximate cause is "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces injury, and without which the result would not have occurred." Id. at 648 (2) (citation

---

[2] Melancon argues that the evidence shows that he took Laura to get medical attention on August 5 as soon as he realized the severity of her injuries and that, because he was not married to Higgenbotham and had not legitimated Laura, he had no legal authority to remove her from her mother's care.

11

and punctuation omitted). "What constitutes proximate cause is undeniably a jury question and is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent." Id. at 652 (2) (citation and punctuation omitted).

A jury could find from the evidence a natural and continuous sequence leading from Melancon's interference in the DFCS investigation in June to Laura's death from intentionally inflicted massive head trauma a month and a half later. There is evidence that Melancon knew Higgenbotham was abusing Laura; that he exercised his control over Long to prevent Long from cooperating with DFCS in its efforts to investigate that abuse; that Long's refusal to cooperate prevented DFCS from locating Higgenbotham or Laura and effectively ended DFCS's investigation; that Higgenbotham continued to abuse Laura; that Laura suffered excessive physical pain from the abuse; and that Laura ultimately died from the abuse. See *Kennedy v. State*, 277 Ga. 588, 589-590 (1) (592 SE2d 830) (2004) (holding that a jury could find a toddler experienced cruel or excessive physical pain from evidence of "the child's age, the extent of her injuries, the nature of the assault to which the child was subjected, and the force with which the child was struck").

A jury could also find that, had Melancon not interfered to end the DFCS investigation, Higgenbotham's abuse of Laura would not have continued. There is evidence that DFCS took several steps to find Higgenbotham and Laura and investigate Long's initial report of abuse. While there is no direct evidence as to what DFCS would have done if Long had cooperated, there is evidence that Higgenbotham was actively abusing Laura at that time. A jury could infer from this evidence that, had DFCS been able to locate Higgenbotham and Laura, it would have intervened in a way to stop the ongoing abuse. See *Nixon v. State*, 349 Ga. App. 277, 282 (1) (b) (826 SE2d 150) (2019) ("jurors are normally entitled to make reasonable inferences from circumstantial evidence regarding all sorts of facts, including the facts necessary to find defendants guilty beyond a reasonable doubt of a crime") (citation and punctuation omitted). See also *Byars v. State*, 311 Ga. 259, 267-268 (2) (857 SE2d 447) (2021) (permitting jury to infer facts demonstrating proximate cause); *Dobson v. State*, 222 Ga. App. 331, 332 (474 SE2d 630) (1996) (same).

The passage of time between Melancon's interference in the DFCS investigation and Laura's death does not preclude a finding of proximate cause. Where, as here, "a crime is defined in terms of the outcome, there can be a time lag

13

between the conduct and the result." *Daddario v. State*, 307 Ga. 179, 186 (2) (a) (835 SE2d 181) (2019) (citation and punctuation omitted).

Melancon argues that Higgenbotham's later abuse of Laura was an intervening act that broke the causal chain between his interference in the DFCS investigation and Laura's death. But

> if the character of an intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

*Calhoun v. State*, 308 Ga. 146, 149 (2) (a) (839 SE2d 612) (2020) (citation and punctuation omitted). See also *Jackson*, 287 Ga. at 654 (3) ("Proximate causation imposes liability for the reasonably foreseeable results of criminal . . . conduct if there is no sufficient, independent, *and unforseen* intervening cause.") (emphasis supplied). It is reasonably foreseeable that if one interferes to stop a DFCS investigation into child abuse that the abuse will continue to occur.

Melancon argues that he could not have foreseen the extent of the later abuse because in June 2017 he was only aware of milder injuries, such as the bruise and

fingernail mark on Laura's face. But he equivocated at trial about the extent of the abuse of which he was aware, and the jury was not required to credit his testimony that his knowledge of the abuse was limited. See *Williams v. State*, 287 Ga. 199, 200 (695 SE2d 246) (2010) (witness credibility was an issue for the jury to resolve). From the trial evidence, the jury was authorized to find that Melancon reasonably could have foreseen that Higgenbotham would continue to abuse Laura, resulting in serious injury to or death of the baby, if he interfered to stop the DFCS investigation of that abuse. See *Calhoun*, supra at 149-150 (2) (a).

In summary, the jury was presented with evidence that Melancon, knowing that Higgenbotham was physically abusive to Laura, took steps to stop DFCS from investigating and acting to prevent further abuse. And the jury was presented with evidence that Higgenbotham's continued abuse caused the baby to suffer and ultimately caused her death. This evidence "was sufficient to find that [Melancon] committed [second-degree murder] and to find that [he] committed cruelty to children in the second degree." *Johnson v. State*, 341 Ga. App. 425, 430 (1) (801 SE2d 294) (2017).

2. *Fatal variance.*

In a separate enumeration of error, Melancon asserts that the "[s]tate argued that the second-degree murder and second-degree cruelty to children [offenses] were committed in a different way than specifically alleged in the indictment — a fatal variance." It appears this enumeration reiterates Melancon's challenge to the sufficiency of the evidence, addressed above, and so it fails for the same reason. See *Bell*, 362 Ga. App. at 706 (3) n. 10. To the extent this enumeration also challenges the state's closing argument, Melancon did not object to that argument at trial, so he has waived appellate review of alleged errors based on that argument. See *Gates v. State*, 298 Ga. 324, 328-329 (4) (781 SE2d 772) (2016).

3. *Ineffective assistance of counsel.*

Finally, Melancon argues that his trial counsel rendered ineffective assistance by making the wrong objection when a lay witness — the detective who led the investigation — testified about battered persons syndrome. To succeed on this claim, Melancon

> must establish both that his counsel's performance was deficient and that he was prejudiced as a result of that deficient performance. . . . If [he] fails to satisfy either part of [this] test, his claim fails, and we need not address the other part. . . . [W]hen reviewing ineffective-assistance claims, we accept the trial court's factual findings unless clearly erroneous, but we independently apply legal principles to the facts.

16

*Moore v. State*, 315 Ga. 263, 265-266 (2) (882 SE2d 227) (2022) (citations and punctuation omitted).

The detective testified that he had twenty-four years of experience in law enforcement with five of those years as a detective in the crimes-against-persons unit. The prosecutor asked the detective whether, in his experience working with crimes against persons, he had encountered victims or witnesses who had been involved in or been victims of domestic violence. When the detective responded yes, the prosecutor then asked: "Is it unusual for a victim of domestic violence to cover for somebody, to lie for somebody, or even minimize even though it may put themselves in trouble?" At that point, Melancon's counsel objected on the ground that the question "request[ed] that the witness comment on other evidence." The trial court overruled the objection, and the detective proceeded to briefly testify about what he referred to as "battered wives' syndrome," in which an abused spouse would lie about the abuse or behave "counterintuitive to common sense" out of fear, even if they had been separated from the abuser for a period of time.

Melancon argues that the detective's testimony on this syndrome was objectionable in two respects: because the testimony amounted to improper bolstering of Long's testimony and because the detective was not qualified to give expert

17

opinion testimony on that subject. These two arguments are interrelated; had the detective been qualified as an expert, the testimony would not have been objectionable, as we have "repeatedly held that expert testimony regarding the cycle of domestic violence . . . is admissible to explain a victim's contradictory testimony." *Works v. State*, 301 Ga. App. 108, 112 (4) (686 SE2d 863) (2009) (citations omitted). See also *Alvarado v. State*, 257 Ga. App. 746, 748 (2) (572 SE2d 18) (2002) ("expert testimony is admissible to explain the behavior of a domestic violence victim who does not report abuse or leave the abuser"). But see *Howie v. State*, 281 Ga. App. 730, 732 (637 SE2d 134) (2006) (holding that "[t]he fact that, in the officer's previous experience, it was not uncommon for domestic violence victims to recant their stories was not relevant to explain either the conduct or the testimony of the victims in the instant case" and so testimony to that effect was irrelevant and improperly bolstering).

We are not persuaded that trial counsel's failure to object to the qualification of the detective as an expert constituted deficient performance, which requires a showing that trial counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). We addressed a similar claim of ineffective assistance in *Pauley v. State*, 355 Ga. App. 47 (842 SE2d 499)

18

(2020), concluding that trial counsel was not deficient in failing to object to an investigator's testimony about the cycle of domestic violence on the ground that the state had not tendered the witness as an expert. Id. at 59-60 (4) (a). We noted the then-applicable statute governing the admissibility of expert witnesses in criminal cases, former OCGA § 24-7-707, provided for broad admissibility, that "[t]o qualify as an expert generally all that is required is that a person must have been educated in a particular skill or profession[,]" and that such "special knowledge may be derived from experience as well as study." Id. at 59 (4) (a) (citation and punctuation omitted). We held that because the evidence in *Pauley* showed that the investigator had such experience and the defendant in that case "pointed to no evidence affirmatively showing that [the investigator] was not qualified to give opinion testimony about victims of domestic violence and sexual assault[,]" the defendant had not demonstrated that his trial counsel was deficient in failing to object to the investigator's testimony, even though the state had not actually tendered that witness as an expert. Id. at 60 (4) (a).

Our holding in *Pauley* controls here. Although former OCGA § 24-7-707 has since been repealed, it was in effect in 2018 when this case was tried. As in *Pauley*, the record in this case would have supported the trial court's qualification of the

19

detective as an expert witness, and Melancon has pointed to no evidence affirmatively showing that the detective was not so qualified. So Melancon has not shown that his trial counsel performed deficiently in failing to object to the testimony on the ground that the detective had not been tendered as an expert witness. See *Pauley*, 355 Ga. App. at 60 (4) (a).

*Judgment affirmed. Brown and Markle, JJ., concur*.