308 Ga. 455
FINAL COPY

S20A0251.  WATTS v. THE STATE.

BOGGS, Justice.

After the trial court granted his motion for new trial, Laurence Frantie Watts was retried before a jury in 2010 and was again found guilty of malice murder and related offenses in connection with the 2003 shooting death of Brent Ogletree. His amended motion for new trial after the retrial was denied, and he now appeals, asserting as his sole enumeration of error ineffective assistance of trial counsel. For the reasons stated below, we affirm.[1]

---

[1] The crimes occurred near midnight on the evening of May 22 to 23, 2003. On April 2, 2004, a Fulton County grand jury indicted Watts for malice murder, two counts of felony murder, aggravated assault with a deadly weapon, possession of a firearm during the commission of a felony, and possession of a firearm by a first offender probationer. At a jury trial from May 17 to 20, 2004, Watts was found guilty of all charges, and the trial court entered a judgment of conviction and sentence. Watts filed a motion for new trial, which the court granted on November 21, 2008, because of an error in the jury instructions. Watts was retried from September 20 to 24, 2010. He was again found guilty of all charges, and on September 27, 2010, the trial court sentenced him to serve life in prison for malice murder plus five years to be served consecutively for possession of a firearm during the commission of a felony. The other counts were vacated by operation of law or merged for

1. (a) Construed in the light most favorable to the jury's verdicts, the evidence at Watts' second trial showed that on May 22, 2003, Watts, known as "Tay," was a drug dealer working in the Venetian Hills neighborhood in southwest Atlanta. Ogletree, known as "Santa Claus," was a crack cocaine user and had purchased drugs from Watts in the past. Ogletree's girlfriend testified that Ogletree was only a user, not a dealer, and that he did not own a gun. His aunt and several acquaintances who saw him that day also testified that he did not have a gun.

Jackie Floyd, who knew both Watts and Ogletree, testified that she and Christopher Champion, who was known as "Champ" or "Bobby," were on Venetian Drive when Watts drove down the street

---

sentencing by the trial court. Although it appears that the trial court should have separately sentenced Watts for possession of a firearm by a first offender probationer, see *Linson v. State*, 287 Ga. 881, 885-886 (4) (700 SE2d 394) (2010), "when a merger error benefits a defendant and the State fails to raise it by cross-appeal," *Dixon v. State*, 302 Ga. 691, 698 (4) (808 SE2d 696) (2017), we generally do not correct the error, and we decline to do so here. Watts filed a motion for new trial, which he amended with new counsel on February 24, 2017. On September 24, 2018, the trial court held an evidentiary hearing at which Watts' lead counsel for the second trial testified. On July 23, 2019, the trial court denied the new trial motion. Watts filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in December 2019 and submitted for decision on the briefs.

and pulled over. Floyd went to the passenger-side window, and about that time Ogletree walked down the street and asked, "Champ, . . . who's that in that car?" Floyd replied, "That's Tay." Floyd thought Ogletree was approaching to purchase drugs. As Ogletree crossed the street, Watts reached under his seat, produced a firearm, and shot Ogletree twice. After Ogletree fell to the ground, Watts got out of the car and shot Ogletree two more times, then got into his car and left. Darren Martin, who had been walking with Ogletree, saw Ogletree start toward Watts' car and heard Ogletree say, "This is Santa Claus," and Watts "just started shooting" before Ogletree reached the middle of the street. Champion testified that Ogletree was still five or six feet from Watts' car when Watts rolled his window down three or four inches and fired over the window, striking Ogletree in the chest. Watts then shot Ogletree again, got out of the car, "and just emptied the pistol." Champion said, "Hey man, what's wrong with you?" and Watts "just looked at [Champion] and frowned, and pulled off."

The police were called almost immediately and arrived to find

Ogletree lying in the street, bleeding. He was pronounced dead at the scene. Police investigators found no gun on his body, only a small pocketknife. The medical examiner testified that the cause of death was a gunshot wound to the chest. Multiple eyewitnesses identified "Tay" to police investigators as the shooter. Champion accompanied police detectives in an unmarked vehicle and showed them Watts' apartment and his car. A car pulled in while they were outside Watts' apartment, and Champion told the detectives, "I think who you are looking for is in that car." When the car left, the detectives followed it until other police vehicles were able to make a traffic stop. Investigators also located and interviewed Watts' girlfriend.

After leaving the scene, Watts called a customer and arranged a drug deal. He told the customer "not to go up to Venetian because somebody had got shot." According to the customer, Watts' demeanor appeared "[j]ust normal, calm." The customer and a passenger drove Watts to the Ben Hill neighborhood to complete another drug deal and then returned to Watts' apartment complex, but Watts "noticed something in the parking lot wasn't right" and

told his customer to drive to East Point. A police helicopter appeared overhead, and Watts began throwing items out of the car. Watts instructed the customer to drive a circuitous course and then jumped out of the car and ran, eluding police. Police officers almost immediately stopped the car and searched the occupants, asking where Watts had hidden the gun.

Watts' neighbor testified that Watts came to his apartment about 10:00 p.m. on May 22 and picked up a pistol that he had left there. Watts later returned, set the pistol down on the coffee table, and walked out. Near dawn on May 23, Watts' girlfriend arrived with the police, and she told the neighbor, "I'm sorry, you-all. The police got him. Give them the gun." Watts ultimately turned himself in on July 1, 2003.

(b) Watts testified at trial, asserting the defense of justification based on self-defense. See OCGA § 16-3-21 (a).[2] He testified that he

---

[2] OCGA § 16-3-21 (a) provides:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself .

had moved into the neighborhood for "[a] change of scenery" and began selling drugs out of a house in the Venetian Hills neighborhood. He claimed that Floyd sold drugs for him and warned him "numerous times" that rival drug dealers did not want him in the area because he was taking away their customers and advised him to "watch [his] back." According to Watts, about two weeks before the shooting, Floyd told him, "you're going to die or you're going to jail." Watts said that when he noticed three individuals loitering across the street from the house from which he sold drugs, Floyd told him that one of the individuals had been told to shoot Watts but "was scared to kill you. He's going to give Santa Claus a gun to kill you. Santa Claus is going to do you." Watts also testified that on the night of the murder, Floyd told him to be sure to carry a gun because "they're going to kill you"; later that evening, Floyd

. . against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23 [defense of habitation], a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself . . . .

flagged down Watts' car, and she and Champion purchased drugs from Watts; and Floyd suddenly called out, "Here goes Tay right here." Watts testified that he heard footsteps approaching from behind, and someone called out, "This is Santa Claus," and Watts was scared and "thought he was about to die." Watts said that he believed that Ogletree was reaching for a gun because he was bent over and was reaching for his side or his back, so Watts began shooting and shot "three to four maybe, maybe five" times before driving away.

Watts also presented evidence of a statement by his sister's boyfriend, given to police on May 23, that Watts told him that somebody was trying to kill Watts. Watts' girlfriend testified that Floyd told her that the other drug dealers in the area were not making any money, and that "they wanted something done to Tay. Basically, wanted him dead, and that Santa Claus would be the one to do it." Watts' girlfriend's sister also testified that Floyd told her that Watts "was either going to go to jail, or he was going to die." She testified that on another occasion Floyd said to Watts, "[Y]ou

need to watch your back because Santa Claus has a hit out for you."

Floyd denied that she ever told Watts that someone was trying to kill him; that she "plant[ed] any seeds at all in [Watts'] head that people were out to assassinate him"; or that she told Watts that Ogletree was going to kill him. She claimed she had not seen Ogletree for a year prior to the shooting and did not even know that Ogletree was out of jail. She also testified that she had purchased drugs from Watts but did not sell or work for him.

(c) Though Watts has not challenged the sufficiency of the evidence to support his convictions, as is this Court's practice in murder cases, we have reviewed the record to determine the legal sufficiency of the evidence. We conclude that the evidence summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Watts was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Shaw v. State*, 292 Ga. 871, 872 (1) (742 SE2d 707) (2013) ("[I]ssues of witness credibility and justification are for the jury to decide, and

the jury is free to reject a defendant's claim that he acted in self-defense." (Citation and punctuation omitted.)).

2. In his sole enumeration of error, Watts alleges that his trial counsel was ineffective in failing to impeach Champion on the variation in his testimony between the two trials. To prevail on his claim of ineffective assistance, Watts must prove both that the performance of his lawyer was professionally deficient and that he was prejudiced by this deficient performance. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Watts must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." (Citation omitted.) *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). To prove prejudice, Watts "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694

(III) (B). "This burden is a heavy one," *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019) (citation omitted), and Watts has not met it.

At the first trial in 2004, Champion was asked what happened and responded:

> A: By the time [Ogletree] walked to the car, the pistol come over the top of the door and shot twice. First time [Ogletree] grabbed him[self]. And the next thing I know, he hit the ground. Guy stood up, put the hand over the door, turned the head and (indicating). . . .
> Q: What happened to Santa Claus?
> A: Just grabbed his chest.
> Q: Okay.
> A: I heard another shot at least. I seen two balls of fire come over. He grabbed the chest on the first one. The second one he hit the ground. When he hit the ground, [Watts] stood over the door, stuck his hand over the door like that, and (indicating).
> Q: After this happened, what did the defendant do?
> A: Got in the car and drove off.

At the 2010 retrial, when Champion was asked what he witnessed, he responded:

> [Ogletree] started toward the car. Before he can get, I guess about five or six feet away from the car, the window cracked about three, four inches and a pistol come up out the window and shot him, apparently in the chest because he grabbed his chest. And he went to fall forward, and all

of a sudden he shot again[ ], and he fell backwards. When he fell backwards, that's when I seen Tay get out of the car, looked over, stuck his hand over the door, and just emptied the pistol. Then I said, hey, man, what's wrong with you? He just looked at me and frowned and pulled off.

Watts contends that Champion's testimony was materially different at the second trial because Champion testified that Watts "emptied the pistol," and that when Champion asked Watts what was wrong with him, Watts looked at Champion, frowned, and then drove off. Watts contends that trial counsel was ineffective in failing to impeach Champion with his earlier testimony because Champion's testimony at the second trial negatively affected Watts' justification defense under OCGA § 16-3-21 (a) by undermining his claim that he "reasonably believe[d] that such force [was] necessary to prevent death or great bodily injury to himself." We disagree.

Trial tactics or strategy "are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *McNair v. State*, 296 Ga. 181,

184 (2) (b) (766 SE2d 45) (2014). More specifically,

> [d]ecisions about what particular questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel. In particular, whether to impeach prosecution witnesses and how to do so are tactical decisions.

(Citation and punctuation omitted.) *Davis v. State*, 306 Ga. 140, 146 (3) (e) (829 SE2d 321) (2019).

Here, Watts' lead counsel for the second trial testified at the hearing on the motion for new trial that in his opinion the testimony was not inconsistent, given that the evidence was undisputed that Watts shot Ogletree multiple times. The trial court ruled that Watts had failed to show that the decision not to highlight the discrepancies in Champion's testimony was professionally deficient performance. The court noted that trial counsel concluded that whatever differences there were in Champion's testimony from one trial to the next were not inconsistent with Watts' justification defense and found that it was objectively reasonable for counsel not to challenge Champion's testimony at the second trial with "impeachment of marginal value which would only highlight the

shooting." The court noted as well that trial counsel cross-examined Champion extensively on his recollection of events.

Trial counsel cross-examined Champion on his close friendship with Ogletree's family, as well as his prior testimony in other respects. Moreover, trial counsel addressed Champion's testimony in her cross-examination of the State's firearms examiner, who testified that although Watts' pistol could hold a total of nine rounds, Watts fired the pistol four times, with three of the shots striking the victim. Trial counsel then asked, "So if someone fired four bullets, they are not unloading the gun?" and the firearms examiner agreed. Finally, Watts himself testified that he fired his pistol "three to four maybe, maybe five" times.

We cannot say that trial counsel's decision not to impeach Champion with the variation in his testimony regarding the shooting was a patently unreasonable trial strategy. A competent attorney might reasonably decide to forgo impeachment on this point so as not to highlight the shooting, and instead cross-examine Champion about his possible bias due to his close relationship with

the Ogletree family and the accuracy of his recollections generally, preferring to challenge the specific testimony that Watts emptied his pistol through the cross-examination of another witness. And, to the extent that Watts complains regarding the testimony at the second trial that Watts "frowned" when Champion spoke to him, Watts failed to question trial counsel about this issue at the motion for new trial hearing, and Watts has failed to show why counsel acted unreasonably by not cross-examining Champion on that minor point. "Counsel's trial decisions are presumed to be strategic, and, absent some evidence to the contrary, an appellant fails to overcome the strong presumption that trial counsel's performance fell within the range of reasonable professional conduct and was not deficient." (Citations omitted.) *Smith v. State*, 300 Ga. 532, 536 (3) (b) (796 SE2d 671) (2017).

Moreover, the evidence that Watts did not shoot Ogletree in self-defense was overwhelming. The jury heard testimony from multiple witnesses that Ogletree was not armed, did not threaten Watts, simply walked toward Watts' car, and was still a considerable

distance away when Watts opened fire. In addition, Watts fired the first shots from inside his car but then stopped, opened the door, stood up, and fired more shots at Ogletree while Ogletree lay wounded on the ground. Watts then fled the scene, remaining at large for more than a month after the shooting.

Accordingly, Watts has failed to show either deficient performance or prejudice. He therefore failed to meet his burden to establish ineffective assistance of trial counsel, and we affirm.

*Judgment affirmed. Melton, C. J., Nahmias, P. J., and Blackwell, Peterson, Warren, Bethel, and Ellington, JJ., concur.*

DECIDED APRIL 6, 2020.
Murder. Fulton Superior Court. Before Judge Schwall.
*Ryan C. Locke*, for appellant.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Marc A. Mallon, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.