NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 16, 2018

S25A0738. EALEY v. THE STATE.

LaGrua, Justice.

Appellant Deanthony Ealey appeals his convictions for malice murder and other crimes related to the shooting deaths of India Royal and Cameron Woods.[1] On appeal, Ealey argues that his convictions should be reversed based on the following contentions: (1) the evidence was insufficient to support the convictions in this

---

[1] Royal and Woods were shot and killed inside their vehicle on January 13, 2017. On May 11, 2017, a Clayton County grand jury indicted Ealey for the following counts: two counts of malice murder (Counts 1 and 2); two counts of felony murder predicated on aggravated assault (Counts 3 and 5); and two counts of aggravated assault (Counts 4 and 6). Ealey was tried from March 25 to 28, 2019, and the jury found Ealey guilty on all counts. The trial court sentenced Ealey to life without the possibility of parole on Counts 1 and 2 (malice murder), to run consecutively, and the remaining counts merged or were vacated by operation of law. Ealey filed a timely motion for new trial, which he later amended through new counsel on March 28, 2024. After holding two evidentiary hearings on the motion for new trial, the trial court denied the motion on October 18, 2024. Ealey filed a timely notice of appeal and the case was docketed in this Court to the April 2025 term and submitted for a decision on the briefs.

case; (2) the trial court abused its discretion by admitting other-acts evidence of two prior incidents under OCGA § 24-4-404(b); (3) the trial court abused its discretion by admitting hearsay evidence; (4) Ealey's trial counsel was constitutionally ineffective in numerous respects; and (5) the cumulative harm of the trial court's errors and trial counsel's deficiency requires reversal. For the reasons that follow, we affirm Ealey's convictions and sentences.

The evidence presented at trial demonstrated that, on the afternoon of January 13, 2017, a passerby discovered Royal and Woods — unresponsive with apparent gunshot wounds — seated in the front driver and passenger seats of a Chevy Malibu parked in the Walmart shopping plaza in Riverdale. The Malibu's windows were up, the car's engine was still running, and music was "playing loudly" from the stereo. Following several 911 calls,[2] Riverdale Police Lieutenant Brandon Criss responded to and secured the scene.

---

[2] One of those 911 calls was admitted at trial and played for the jury.

GBI Agent Jerri Lynn Coody, who was qualified at trial as an expert in crime scene investigation, arrived at the Walmart shopping plaza that afternoon and later testified about her observations at the scene.[3] According to Agent Coody, both victims' seat belts were fastened; the Chevy Malibu's taillights were on; "Royal's foot was on the brake pedal"; and neither body had been moved. Royal's hands were in her lap, and Woods was holding "two bags of suspected marijuana" in his left hand — each containing "over an ounce of marijuana," which was "indicative of distribution." An additional bag of marijuana was inside the vehicle, along with clear sandwich bags, bags of white and yellow pills, a pill grinder, and a digital scale. Woods had $88 in cash in one of his pockets and an additional $240 in cash in his wallet. Agent Coody testified that, based on the drug paraphernalia and cash inside the vehicle, there "could've been earlier drug sales involved or the [sale] of a quantity of marijuana."

---

[3] Agent Coody photographed the victims and the interior and exterior of the Chevy Malibu, and those photographs were admitted into evidence during trial.

Agent Coody also discovered "a Glock .40 caliber pistol" on the right side of Woods's body, between the front passenger seat and the passenger-side door, the "barrel" of which was "pointing upwards towards ... the ceiling of the roof of the car." Given the placement of this weapon, Agent Coody opined that the gun had fallen "from its position and slid between the seat and the door." Agent Coody also located a "a 9mm cartridge" in the "front passenger's interior side of the door," which she testified could not and did not come from the .40 caliber pistol located next to Woods. In the driver's seat, Agent Coody found "bullet fragments and three FC brand 9mm cartridge casings," as well as four additional "9mm cartridge casings, [a] bullet, and two jacket fragments ... within the white Malibu." The State's expert in firearms examination testified at trial that the 9mm shell casings recovered from the Chevy Malibu were all fired from the same 9mm handgun. The expert further concluded that, "[b]ased off the class characteristics" and "design features" of the cartridge cases, the gun used to fire these bullets was "consistent with Glock 9mm pistols" and "possibl[y] ... a Glock 26."

4

The medical examiner testified that Woods's cause of death was "a gunshot wound of the neck," caused by a bullet that traveled through the left side of Woods's neck "below the ear" and exited out through the right side of the neck.[4] The medical examiner noted that the "gunshot entrance wound" was surrounded by "a dried red abrasion" and "black powder soot," indicating a "close-range injury." As to Royal, the medical examiner testified that Royal's cause of death was "gunshot wounds of the torso and right arm." The medical examiner observed that Royal had "two gunshot entrance wounds" from an "indeterminate range" — one was located "on the upper right side of the back," which exited "through the left side of the chest," and "a second wound path that involved the right forearm."

On the afternoon of January 13, Lieutenant Criss reviewed surveillance videos from various businesses in the Walmart shopping plaza, including the Walmart and a restaurant located

---

[4] The medical examiner concluded that the "manner" of Woods's death was "homicide." On cross-examination, Ealey's trial attorney asked if it was possible that this incident was a "murder-suicide," and the medical examiner testified that, if Woods "was left-handed or ambidextrous and holding a gun to his neck," it was "possible" his gunshot wound "could have been self-inflicted."

close to where the victims' car was parked. The surveillance videos from Walmart and the restaurant, which were admitted at trial, established that, between approximately 12:15 p.m. and 12:49 p.m. on January 13, a "two-tone" Mercury Mountaineer — with white "on top and dark on the bottom," "chrome wheels," "a bug deflector on the hood," and "a roof rack" — drove around the Walmart shopping plaza and in front of the Walmart, occasionally parking "for several minutes." At 12:49 p.m.,[5] the same white Mercury Mountaineer drove over and parked in the area where the victims' car was discovered. At 12:51 p.m., the victims' white Chevy Malibu backed into a parking space in front of the Mountaineer. No one exited the Malibu. At 12:52 p.m., a person, whose face is not clearly visible, got out of the driver's side of the Mountaineer, "walk[ed] up" to the Malibu, "approache[d] the driver's side rear [door], and open[ed] up the rear door and then close[d] it" without entering. That same person then walked around the back side of the Malibu to the

---

[5] Lieutenant Criss testified that the timestamp on the restaurant's surveillance videos actually reflected the time as 1:49 p.m., but he learned during his investigation that the real time was an hour behind.

passenger side rear door, opened the rear door, and entered the Malibu. Lieutenant Criss testified that the person who entered the Malibu from the Mountaineer was "extremely tall." A short time later, the person exited the Malibu from the rear passenger door, walked back to the Mountaineer, got into the Mountaineer on the driver's side, and the Mountaineer drove away. After watching an additional two hours of the restaurant's surveillance videos, Lieutenant Criss determined that no one else ever entered or exited the Malibu. Lieutenant Criss was also able to obtain tag information for the Mountaineer from one of the surveillance videos.

Lieutenant Criss testified that he ran the Mountaineer's license plate and determined that it was registered to Diane Corbet Ealey at a residential address in Alabama. Lieutenant Criss then searched "a tag reader system" with cameras positioned on the interstate "around the state of Georgia, which showed that, on January 13, at 5:06 p.m., the Mountaineer was traveling on "I-85 southbound," heading "towards Alabama." On January 15, Lieutenant Criss spoke to Diane Ealey, and he traveled to Alabama

7

to recover the Mountaineer. Diane advised Lieutenant Criss that, on January 9, she loaned the Mountaineer to Ealey because "[h]is car was being worked on," and Ealey returned the vehicle to her on the evening of January 13.

Agent Coody testified that the Mountaineer was towed to GBI headquarters, and pursuant to a search warrant, she conducted a search of the vehicle and located a receipt reflecting a $500 withdrawal at 4:01 p.m. on January 13, 2017 at a bank in Union City. Surveillance images from that bank established that, between 4:01 and 4:03 p.m. on January 13, a man — later identified as Ealey — completed a transaction at the drive-through ATM, driving the same white Mercury Mountaineer depicted in the surveillance videos from the Walmart shopping plaza.

At trial, Detective Clint Patton of the Fayette County Sheriff's Office was qualified as an expert in forensic cell phone analysis, and he testified that he conducted a search of Woods's cell phone pursuant to a search warrant. Woods's cell phone records demonstrated that, at around 12:00 p.m. on January 13, Woods's

phone received a phone call lasting "a minute and 36 seconds" from a phone number ending in -4094, which was "NA" — meaning the "phone number [wa]s not stored in" the contacts on Woods's phone. At 12:19 p.m., Woods's phone received a text message from the same phone number ending in -4094, stating "I'm up here, bro." At 12:29 p.m., Woods's phone received another phone call from the phone number ending in -4094 that lasted "24 seconds." At 12:45 p.m., Woods's phone sent a text message to the phone number ending in -4094, stating "5 away" and then, a few seconds later, "Where u park?" At 12:50 p.m., Woods's phone placed a call to the phone number ending in -4094 that lasted "one minute and 16 seconds." This was the last outgoing communication made from Woods's cell phone.

On the morning of January 20, Lieutenant Criss met with Ealey at his place of employment. According to Lieutenant Criss, when Ealey entered the conference room for their meeting, Criss was immediately struck by Ealey's height, which was "between 6'4" and 6'5"." Lieutenant Criss audio-recorded his conversation with

9

Ealey, but did not read Ealey his *Miranda*[6] rights because Ealey "wasn't in custody." As reflected in the audio-recording of this conversation, which was played at trial, Lieutenant Criss initially advised Ealey that he could "talk to [Lieutenant Criss] or not," and Ealey said he would "talk a minute" but then needed "to get back to work." Lieutenant Criss told Ealey that he was investigating "an incident [that] occurred" in Riverdale on January 13, 2017, in which Ealey's "mother's SUV was involved." Ealey told Lieutenant Criss that he took a "personal holiday at work" on January 13 and that he was the only person "driving his mother's SUV ... that entire day." Lieutenant Criss informed Ealey that "[s]omebody got killed at the Riverdale Walmart in the parking lot" on January 13, and Ealey said he did not "know nothing about it." Lieutenant Criss then showed Ealey a photograph of the white Mercury Mountaineer captured in the Walmart surveillance videos. Ealey acknowledged that the vehicle "look[ed] like" his mother's car, but said he could not remember whether he went to the Riverdale Walmart that day.

---

[6] See *Miranda v. Arizona*, 384 US 436 (1966).

10

Ealey was permitted to leave after this interview, but he later turned himself in to law enforcement and was arrested.

1. Ealey first contends that the evidence in this case was insufficient as a matter of constitutional due process to support his convictions for malice murder because the State failed to meet its burden to prove beyond a reasonable doubt that Ealey was the shooter. See *Jackson v. Virginia*, 443 US 307, 319 (1979). Ealey also contends that the evidence in this case was insufficient as a matter of Georgia statutory law because the State's case was entirely circumstantial, and the State failed to "exclude every reasonable hypothesis" other than Ealey's guilt, as required by OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."). We see no merit to either of these claims.

(a) When we evaluate "a due process challenge to the sufficiency of the evidence, we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any

11

rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Shellman v. State*, 318 Ga. 71, 74 (2024) (cleaned up). And "[w]e defer to the jury's resolution of any conflicts in the evidence, the credibility of witnesses, and the drawing of reasonable inferences from the facts." *Hooks v. State*, 318 Ga. 850, 852 (2024). See also *Ridley v. State*, 315 Ga. 452, 455 (2023) ("In [assessing the constitutional sufficiency of the evidence], we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury.").

The evidence here was sufficient as a matter of constitutional due process to authorize the jury to find Ealey guilty beyond a reasonable doubt of malice murder and the other offenses of which he was convicted. See *Ridley*, 315 Ga. at 455 (holding that the "jury's verdicts will be upheld" as long as "some competent evidence," even if circumstantial and contradicted, "supports each fact necessary to make out the State's case"). Here, the evidence established that, on the afternoon of January 13, 2017, Royal and Woods were shot and

killed by 9mm bullets while seated inside their Chevy Malibu in the Walmart shopping plaza. The only shell casings recovered inside the vehicle were fired from a Glock 9mm handgun — the same handgun used to shoot the victims — which was never found.

In the 30 minutes leading up to the shootings on January 13, a white Mercury Mountaineer was captured on multiple surveillance videos driving around the Walmart shopping plaza, and this Mountaineer was distinguishable from similar cars in the vicinity based on its unique features — two-toned color (white on the top, dark on the bottom), bug deflector, roof rack, and chrome rims. During this same timeframe, Woods's cell phone was communicating with an unknown phone number regarding the estimated time of his and Royal's arrival. When Woods's phone texted this phone number that he was "5 away," the Mercury Mountaineer traveled to and parked in an area of the shopping plaza monitored by the restaurant's surveillance videos, and those videos captured the victims' Chevy Malibu arriving a short time later, parking in front of the Mountaineer. The driver of the Mercury

Mountaineer — a tall man, which was consistent with Lieutenant Criss's description of Ealey — was then recorded entering the back seat of the Chevy Malibu and exiting again a minute later. The surveillance videos established that the driver of the Mercury Mountaineer was the only person to enter or exit the Chevy Malibu while it was parked in the Walmart shopping plaza. Law enforcement officers traced the Mercury Mountaineer's tag number — which had been captured on the Walmart surveillance videos — to Ealey's mother, who testified that Ealey had the Mountaineer on January 13 and returned it to her in Alabama that evening. Ealey's mother's testimony was corroborated by photographic images taken by license plate readers positioned along I-85, which showed that the Mountaineer traveled southbound on I-85 from an area south of Atlanta toward Alabama on the evening of January 13. Surveillance videos from a bank ATM in Union City also placed Ealey inside the Mountaineer a few hours after the murders, and he admitted during a subsequent interview with Lieutenant Criss that he was the only person who had driven the Mountaineer "that entire day."

Viewed in the light most favorable to the verdicts, this evidence authorized the jury to conclude that Ealey shot Royal and Woods and to find him guilty of malice murder. See *Ridley*, 315 Ga. at 455 (concluding that, after applying the constitutional-sufficiency standard, the circumstantial evidence presented was "sufficient to support" the defendant's convictions).

(b) Turning to Ealey's statutory claim, Ealey asserts that the evidence presented at trial did not "exclude every other reasonable hypothesis save that of [his] guilt," OCGA § 24-14-6, arguing that, at most, the evidence showed that he was near the crime scene before the murders, having merely driven his mother's Mercury Mountaineer through the Walmart shopping plaza shortly before the shootings occurred. Ealey further argues that the evidence did not exclude the possibility that one of the victims shot the other person and then turned the gun on himself or herself. We disagree.

Under Georgia statutory law, when a "conviction is based on circumstantial evidence, the State must present sufficient evidence to 'exclude every other reasonable hypothesis save that of the guilt

15

of the accused.'" *Hooks*, 318 Ga. at 853 (quoting OCGA § 24-14-6). But "[n]ot every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable." *Drennon v. State*, 314 Ga. 854, 861–62 (2022) (cleaned up). "Whether alternative hypotheses are reasonable is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law." Id. (cleaned up).

We conclude that the evidence recounted above, even if circumstantial, authorized the jury to reject Ealey's hypothesis that he was merely present near the crime scene before the shootings occurred or that the victims' deaths were potentially caused by a murder-suicide. The medical examiner testified that the cause of the victims' deaths was homicide, and his testimony also demonstrated the implausibility of concluding that any of the victims' gunshot wounds were self-inflicted. Accordingly, we see no reason to disturb the jury's conclusion that Ealey was guilty of the crimes of which he was convicted. See *Drennon*, 314 Ga. at 863.

2. Ealey next contends that the trial court erred by admitting other-acts evidence against him at trial under OCGA § 24-4-404(b) ("Rule 404(b)"). At trial, after giving limiting instructions to the jury, the trial court allowed the State to introduce evidence of two prior incidents involving Ealey for purposes of showing — with respect to both of the incidents — his intent and motive under Rule 404(b) and — with respect to one of the incidents — as intrinsic evidence to show that, during a prior traffic stop, Ealey possessed a Glock 26 9mm handgun, which was returned to him after his arrest and which could have been used to shoot the victims in this case, as it was consistent with the type of weapon used in the murders. "We review the trial court's decision to admit [Rule 404(b)] evidence for an abuse of discretion." *Roberts v. State*, 315 Ga. 229, 235 (2022).

The first incident occurred in 2013 (the "robbery incident") and was presented through the testimony of the victim, Beverly Porter, and the arresting officer, Sergeant J.P. Smallwood. Porter testified that, on July 1, 2013, around 11:00 p.m., Porter accompanied her son to a gas station to buy a cell phone "from some guys," and Porter

17

waited in the car while her son went into the store. While Porter was waiting, she noticed a "black Charger" pull into the gas station and back into a parking space in front of her car. Soon after, a man — later identified as Ealey — "open[ed] the back door and g[ot] in" the backseat of Porter's car, pointing a gun at her, and Porter assumed he was the man meeting her son to sell his phone. The man told Porter he "want[ed] the $300" and asked if there was a "gun in the car." Porter "told him no," but the man "told [her] to open the glove compartment to show him that there wasn't a gun inside the glove compartment." After Porter did so, the man "asked for the keys," as well as her cell phone and her purse, which she gave to him. Porter testified that the man kept the gun pointed on her the "whole time" in "the space between both seats." Around this time, Porter's son exited the store, and the man got out of the car, yelling, "Do you still wanna buy the phone?" Porter's son pulled a gun and "started shooting." The man got into the black Charger and sped away from the gas station. A minute or so later, Porter heard "a crash." At trial,

Porter identified Ealey as the man who got into the back seat of her car and pointed a gun at her on July 1, 2013.

Sergeant J.P. Smallwood provided additional testimony about the robbery incident at trial. According to Sergeant Smallwood, at 12:15 a.m. on July 2, 2013, he responded to "an armed robbery attempt" at a gas station, and "[l]ess than 200 yards" from the gas station, he "observed a black Dodge Charger sitting in a ditch on the left-hand side of the road." Sergeant Smallwood spoke to the two men who were standing outside the vehicle — one of whom was later identified as Ealey. Prior to taking the men into custody, Sergeant Smallwood patted them down, and in Ealey's pockets, he located "a set of keys" and "an iPhone that was later identified as belonging to [Porter]."

The second incident occurred in 2016 (the "gun incident") when the car in which Ealey was a passenger was stopped by Fayette County Sheriff's Deputy David Rojas, and Ealey admitted to owning a Glock 26 9mm handgun found in the car. Deputy Rojas testified that, on February 16, 2016, he conducted a traffic stop of a vehicle,

19

and prior to stopping the vehicle, he observed "a bag" being thrown out of the passenger-side window.[7] When the vehicle stopped, Ealey "was in the [front] passenger seat," and as he got out of the car, he told Deputy Rojas, "There's a gun in the vehicle, and it's registered to me." Deputy Rojas collected a Glock 26 9mm handgun from the car. Deputy Rojas arrested Ealey and the driver of the vehicle, and after determining Ealey was not "a convicted felon," Deputy Rojas put Ealey's handgun in "safekeeping." Ealey was later released from custody and collected his Glock 26 9mm handgun on April 28, 2016.

On appeal, Ealey contends that the trial court abused its discretion in admitting the gun and robbery incidents because, among other things, any probative value of the prior acts was substantially outweighed by the risk of unfair prejudice to Ealey. For the reasons explained below, these claims fail.

(a) As to the gun incident, we conclude that the trial court did not abuse its discretion in admitting evidence that Ealey owned and

---

[7] Deputy Rojas recovered the bag and determined it to be "a small bag of marijuana."

possessed a Glock 26 9mm handgun several months prior to the murders because this evidence was intrinsic to the crimes at issue in this appeal, and the "limitations and prohibition" on other-acts evidence set out in Rule 404(b) "does not apply to intrinsic evidence." *Williams v. State*, 302 Ga. 474, 485 (2017).

> To this end, we have said that evidence is considered intrinsic to the charged offense when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense.

*Roberts*, 315 Ga. at 236 (cleaned up).

Here, testimony establishing that, several months prior to the murders, Ealey owned a Glock 26 9mm handgun — which he possessed during a prior arrest and which was returned to him following that arrest — was "admissible intrinsic evidence" because it was "reasonably necessary to complete the story of the crime[s] for the jury." *Harris v. State*, 310 Ga. 372, 378 (2020) (cleaned up). In this context, we have said that "'necessary' is not used in a strictly literal sense, but rather, refers to what evidence is reasonably

21

necessary for the State to complete the story of the crime." Id. at 379.

In this case, the State's firearms expert determined that the handgun used to shoot and kill the victims was consistent with a Glock 26 9mm handgun. Accordingly, evidence showing that Ealey owned and possessed that same type of handgun several months before the murders "added significant weight" to the State's theory that Ealey was the shooter in this case — especially since the murder weapon was never recovered. *Harris*, 310 Ga. at 379. See, e.g., *United States v. Brooks*, 715 F3d 1069, 1076–77 (8th Cir. 2013) (concluding that photographs and a video showing the defendant posing with a gun were intrinsic, where the gun appeared to be the same gun used in the charged crimes); *United States v. Shea*, 159 F3d 37, 39–40 (1st Cir. 1998) (determining that the gun seized during the defendant's arrest for a separate crime, which occurred after the charged crime, was admissible as intrinsic evidence where the government sought to prove it was the same gun used in charged crime).[8] And, as intrinsic evidence, this "limited

---

[8] This Court looks to federal case law to interpret and apply provisions

22

evidence" from the gun incident was "admissible as long as it satisfied OCGA § 24-4-403, … and there is little question that it did." *Roberts*, 315 Ga. at 238 (citing *Harris v. State*, 313 Ga. 225, 232 (2022) ("[I]ntrinsic evidence must satisfy Rule 403.")). See also OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

The testimony regarding Ealey's ownership of a Glock 26 9mm handgun had significant probative value because, again, the victims were shot with a 9mm handgun, consistent with a Glock 26, and the actual murder weapon was never recovered. And the need for this type of evidence was even greater in this case given its circumstantial nature and because Ealey denied any involvement in the murders. See *Lee v. State*, 318 Ga. 412, 419 (2024) (concluding

---

of Georgia's new Evidence Code that are "materially identical" to the Federal Rules of Evidence, which OCGA §§ 24-4-403 and 24-4-404 are in this case. *Redding v. State*, 320 Ga. 107, 114 (2024) (citation omitted).

that evidence regarding the defendant's prior possession of a handgun similar to the one used to shoot the victims was highly probative where the murder weapon was never recovered and the case was based on circumstantial evidence). Additionally, evidence that Ealey owned a Glock 26 9mm handgun and properly notified police of his possession of that weapon during a traffic stop was not likely to inflame the passion of the jury against him. See *Willis v. State*, 315 Ga. 19, 28 (2022) (determining no prejudice where the admission of the defendant's prior conviction was "unlikely to inflame the jury's passions against him") (cleaned up). Thus, "given its strong probative value, this intrinsic evidence was not the evidence of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect, that Rule 403 contemplates excluding," *Roberts*, 315 Ga. at 238 (cleaned up), and the trial court did not abuse its discretion in admitting evidence of Ealey's possession of a Glock 26 9mm handgun at trial.

(b) As to the remaining evidence presented about the gun incident — including the arresting officer's testimony that he

observed a small bag being thrown from the vehicle prior to the traffic stop, which was later determined to contain marijuana — we conclude that, while this evidence would not have been admissible as intrinsic evidence on its own, any error in admitting it under the circumstances was harmless, particularly since the recovered bag of marijuana was never linked to Ealey, who was a passenger in the vehicle, at trial.

(c) As for the evidence presented about the robbery incident, while we cannot say this evidence was not admissible to show Ealey's motive or intent under Rule 404(b), we nevertheless conclude — for the reasons discussed below — that any evidentiary error in admitting it was harmless.

> A non-constitutional evidentiary error requires reversal only if it harms a defendant's substantial rights, and we determine whether such harm occurred by asking whether it is highly probable that the error did not contribute to the verdict. As part of that determination, we review all the evidence de novo, after setting aside the evidence admitted in error, and we weigh the remaining evidence as we would expect reasonable jurors to have done so.

*Roberts*, 315 Ga. at 239 (cleaned up). See also *Kitchens v. State*, 310

25

Ga. 698, 702 (2021) (cleaned up) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.").

Here, the properly admitted evidence against Ealey was strong and included the intrinsic evidence from the gun incident showing that Ealey owns a Glock 26 9mm handgun similar to the one used to kill the victims in this case. The evidence also showed that, when law enforcement officers ran the license plate on the Mercury Mountaineer that was captured on surveillance videos in the area of the crime scene, the vehicle was registered to Ealey's mother at an Alabama address, and she told law enforcement that Ealey had possession of her vehicle that day. Ealey also admitted during his interview with Lieutenant Criss that he was near the crime scene prior to the murders; he was the only one driving his mother's Mountaineer on the day of the murders; and his mother's Mountaineer looked similar to the Mountaineer that was parked in the area where the shootings occurred. The evidence also showed that Ealey had the same body-type as the driver of that

26

Mountaineer, whom surveillance videos captured entering and exiting the victims' Chevy Malibu before and after the shootings and who was the only person to enter and exit the Malibu prior to the discovery of the victims' bodies several hours later.

Given the strong evidence of Ealey's guilt in this case, it is highly probable that the admission of evidence about the details of the gun incident (i.e., the marijuana) and the robbery incident did not contribute to the verdicts and, thus, was harmless. See *Kitchens*, 310 Ga. at 702. Moreover, the trial court's limiting instructions to the jury about how they should consider and use this other-act evidence at trial mitigated any prejudicial effect from the admission of these prior incidents. Therefore, in light of the strong evidence and the instructions to the jury, we conclude that, if there was any trial court error in the admission of this evidence, it was harmless. See *Roberts*, 315 Ga. at 240. Accordingly, Ealey's Rule 404(b) argument fails.

3. Ealey next contends that the trial court erred by allowing Lieutenant Criss to testify on direct examination that, during his

27

investigation of the victims' death on January 13, 2017, he learned that the timestamp on the restaurant's surveillance videos was an "hour off." Ealey argues that this testimony was hearsay because it was an out-of-court statement made to Lieutenant Criss for the truth of the matter asserted — specifically, what time the events occurred as recorded on the restaurant's surveillance videos.

Assuming without deciding that Lieutenant Criss's testimony improperly relied upon inadmissible hearsay, any error in admitting that testimony was harmless under the nonconstitutional harmless error standard. Again, "[t]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kingdom v. State*, 321 Ga. 363, 369 (2025). In determining whether the error contributed to the verdict, we "review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." *Kitchens*, 310 Ga. at 702.

Viewing the record in this way, the evidence properly admitted at Ealey's trial showed that, regardless of the time discrepancy in the restaurant's surveillance videos, Ealey's mother's vehicle —

28

which Ealey was admittedly the only person in possession of and which had a unique body style — was driving around the Walmart shopping plaza before the shootings occurred, was present at the crime scene at the time of the shootings, and fled the crime scene immediately after the shootings. Minutes before the shootings, a person matching Ealey's description exited this vehicle, entered the victims' vehicle, exited the victims' vehicle, and was the last person to physically interact with the victims until their bodies were discovered a few hours later. Additionally, forensic evidence demonstrated that the victims were shot with a Glock 9mm handgun — likely a Glock 26 — which was never recovered and which was the same kind of gun owned by Ealey.

Given this evidence of Ealey's guilt, reasonable jurors could conclude that Ealey was the shooter in this case, despite Lieutenant Criss's brief hearsay statement explaining the incorrect time on the surveillance videos. As such, it is highly probable that the admission of Lieutenant Criss's testimony was harmless and did not contribute to the guilty verdicts. See *Kingdom*, 321 Ga. at 369 (concluding that

29

any error in admitting the detective's testimony relying on hearsay was harmless under the nonconstitutional harmless error standard). See also *Hampton v. State*, 308 Ga. 797, 802–03 (2020) (assuming error in the admission of hearsay, the error was harmless given the other evidence pointing to the appellant's guilt). Thus, Ealey's hearsay claim fails.

4. Ealey argues that his trial counsel was constitutionally ineffective in a number of respects, broadly categorized as (1) a failure to adequately investigate and/or introduce helpful evidence and to adequately cross-examine witnesses; (2) a failure to call a firearms expert; (3) a failure to renew an objection following the jury charges, to make the correct objection to the admission of certain exhibits, and to object to hearsay evidence at trial; and (4) a failure to request that closing arguments be transcribed. These claims fail under the standard set forth in *Strickland v. Washington*, 466 US 668, 687 (1984).

"To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was

deficient and that the deficient performance resulted in prejudice to the defendant." *Moss v. State*, 311 Ga. 123, 126 (2021) (citing *Strickland*, 466 US at 687–95). "In reviewing either component of the inquiry, all factual findings by the trial court will be affirmed unless clearly erroneous." *Winters v. State*, 305 Ga. 226, 230 (2019).

"To prove deficient performance, a defendant must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Nesbit v. State*, 321 Ga. 240, 246–47 (2025).

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

Id. at 247 (cleaned up). "To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Moss*, 311 Ga. at 126. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the

reviewing court does not have to examine the other prong." Id. (cleaned up).

(a) Ealey first contends that his trial counsel performed deficiently by failing to adequately investigate the case; by failing to introduce helpful evidence at trial, including evidence of another 9mm handgun discovered during the investigation — which was excluded as the murder weapon — and additional cell phone records tied to Woods and Ealey; and by failing to adequately cross-examine witnesses at trial. Ealey's contention that his trial counsel was deficient in these respects fails.

"Decisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel. And decisions as to what evidence to present ... are ordinarily matters of trial strategy and provide no ground for reversal." *Morrison v. State*, 303 Ga. 120, 126 (2018).

At the motion-for-new-trial hearing, Ealey's trial counsel testified that she reviewed all the discovery turned over by the State, in addition to conducting her own thorough investigation of the

identified facts and evidence in this case, and her decisions regarding what evidence to introduce and what questions to ask witnesses on cross-examination were tactical ones, based on her decades of experience as a criminal defense attorney and her evaluation of the unique facts of this case. With respect to Ealey's contention that there was evidence his trial counsel should have introduced at trial, Ealey's trial counsel testified that she did not seek to admit this evidence because it would have "added nothing" to the defense's argument that Ealey was not the shooter and was otherwise not relevant or favorable to Ealey.

On appeal, Ealey bears the burden of showing that trial counsel's actions here were "patently unreasonable," *Lockhart v. State*, 298 Ga. 384, 386 (2016), and he has failed to demonstrate that his trial counsel's decisions in assessing how to cross-examine witnesses and what evidence to present were decisions "no competent attorney" would have made under the circumstances. *Hughs v. State*, 312 Ga. 606, 612 (2021). See also *Morrison*, 303 Ga. at 126. As such, this claim fails.

(b) Ealey's allegation that his trial counsel was deficient for failing to present a firearms defense witness at trial also fails. "The decision [of] whether to call an expert witness is a matter of trial strategy within the broad range of professional conduct afforded trial attorneys." *Davis v. State*, 290 Ga. 584, 586 (2012). When the Court considers a claim of ineffective assistance in this context, we "must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance," and thus, "a tactical decision will not form the basis for an ineffective assistance of counsel claim unless it was so patently unreasonable that no competent attorney would have chosen it." *Hughs*, 312 Ga. at 612 (cleaned up).

At the motion-for-new-trial hearing, Ealey presented a firearms expert, who testified that the 9mm handgun used to shoot the victims was also consistent with non-Glocks. Ealey's trial counsel testified that she did not call a firearms expert to testify at trial because she did not think it was necessary, especially since the murder weapon was never located and since she had the opportunity

34

to conduct a thorough cross-examination of the State's firearms expert at trial, during which she elicited testimony that he could not determine the "specific firearm" used in the shootings because he could not say that the "cartridge cases came from a specific single gun without having that specific single gun." Ealey's trial counsel also testified that, based on her communications with Ealey, she did not think the testimony of a firearms expert would ultimately be helpful to Ealey.

Again, "[o]ur inquiry is focused on the objective reasonableness of counsel's performance." *State v. Tedder*, 305 Ga. 577, 584 (2019) (cleaned up). Based on the record before us, we cannot say that trial counsel's decision not to call a firearms expert to testify at trial "was so patently unreasonable that no competent attorney would have chosen it." *Hughs*, 312 Ga. at 612.

(c) Ealey also claims that his trial counsel was ineffective by failing to raise or make proper objections at trial. Specifically, Ealey contends that trial counsel was deficient for failing to renew her objection to the trial court's decision not to charge the jury on mere

presence — a charge which the trial court advised the parties it would not give "because the appellate courts have held that that principle is adequately embraced in the [c]ourt's charge on burden of proof and proof beyond a reasonable doubt," **«T6.53»** and which Ealey did not question his trial counsel about during the motion-for-new-trial hearing. Ealey also contends that his trial counsel made an incorrect continuing-witness objection when the State's latent fingerprint report and autopsy report were admitted at trial — as opposed to when the exhibits went out with the jury — but the record does not show that those exhibits were improperly admitted or even went out with the jury during deliberations, and Ealey did not establish otherwise at the motion-for-new-trial hearing. Finally, Ealey contends that his trial counsel failed to object when two of the prior-acts witnesses relied upon hearsay in testifying about what occurred during the robbery incident — namely, Porter's reliance upon her son's assertion that he was at the gas station to buy a cell phone, and Sergeant Smallwood's reliance on a non-testifying witness's statement that someone inside the Black charger fired a

gun as the vehicle was leaving the gas station — a failure that Ealey did not question his trial counsel about during the motion-for-new-trial hearing. Nevertheless, even if we assume that trial counsel was deficient in these respects, Ealey has not established a reasonable probability that, had counsel made the proper objections, the outcome of his trial would have been different. See *Jackson v. State*, 318 Ga. 393, 401 (2024) (determining no prejudice where appellant failed to show that his trial counsel's failure to object to certain witness testimony and evidence affected the trial results).

Here, the jurors saw and heard the strong evidence presented at trial, which included surveillance videos of the crime scene and surrounding area; law enforcement's connection of the Mercury Mountaineer observed on surveillance videos near the crime scene to Ealey's mother, to whom that vehicle was registered and who said Ealey had the vehicle all day; and Ealey's admission that he was in close proximity to the crime scene at the time of the shootings and was using his mother's Mountaineer, which was strikingly similar to the vehicle involved in the crimes. See *Kitchens v. State*, 289 Ga.

37

242, 244 (2011) (concluding there was no prejudice in failing to object to testimony where there was otherwise strong evidence of appellant's guilt). In light of the strong evidence against Ealey, "there is not a reasonable probability that the trial result would have been different" had Ealey's trial counsel made the alleged objections. *Jackson*, 318 Ga. at 401 (cleaned up). See also *Morrison*, 303 Ga. at 126 (holding that "decisions as to ... whether to raise a specific objection are ordinarily matters of trial strategy and provide no ground for reversal"). As such, this claim fails.

(d) Finally, Ealey contends that his trial counsel was deficient for failing to request that closing arguments be taken down by the court reporter. This claim also fails.

The record reflects that, a little more than three years after trial, Ealey filed a motion to supplement the record, asserting that "[t]he jury trial transcript [wa]s not complete because it [wa]s missing the opening statements and closing arguments" and that those "portions of the transcript [we]re material and necessary" for Ealey "to raise all possible issues on appeal" and in his motion for

new trial. Ealey also argued that, because the opening statements and closing arguments were not recorded or transcribed and he had "the burden of completing the record to support his contentions," the trial court "should hold a hearing to make the record conform to the truth" and prepare a transcript "by recollection" to be "admitted into the record."

A few months later, the trial court held a hearing on Ealey's motion to complete the record, and Ealey called the prosecuting attorney and Ealey's trial counsel to testify in an attempt to recreate opening statements and closing arguments. Following the hearing, the trial court ordered that the transcript of the motion-to-complete-the-record hearing be filed into Ealey's case and admitted into the record.

During the motion-to-complete-the-record hearing, the judge inquired of Ealey's trial counsel whether there had been "a request for the openings and closings to be taken down" at trial, and Ealey's trial counsel responded, "I don't recall if there was or not, … [but] I'm sure that if there was it would have been done," further noting

that openings and closings are not required by law to be transcribed. Trial counsel testified similarly at the subsequent hearing on Ealey's motion for new trial.

On appeal, Ealey contends that his trial counsel was deficient in failing to request that closing arguments be taken down because "[r]easonable attorneys … request closing arguments to be recorded [since] closing arguments are routinely used by this Court to assess harm." Ealey also argues that his trial counsel's deficient performance in this respect was prejudicial because "Ealey's burden to show harm for his 404(b) arguments is more difficult without closing arguments."

While we can envision a case where the failure to take down closing arguments could constitute deficient performance, we cannot say that Ealey's trial counsel was deficient here based on the limited record before us.[9]  See *Parker v. State*, 320 Ga. 572, 579 (2024)

---

[9] We have previously rejected claims of deficient performance for failure to ensure that arguments of counsel were transcribed. See *Dunlap v. State*, 291 Ga. 51, 53 (2012) (concluding that, under OCGA § 17-8-5, "[t]he arguments of counsel are not required to be transcribed," and where trial counsel testified that "it was his custom and practice not to request the transcription of …

("Deficient performance means that no reasonable lawyer would have done what trial counsel did." (quotation marks omitted)). And, while we acknowledge that this Court commonly assesses harm or prejudice to an appellant by how improperly-admitted evidence was used in closing arguments at trial,[10] rendering it a better practice to ensure those arguments are transcribed, Ealey has merely asserted, but not shown, how he was prejudiced by the lack of transcription here. See id. ("[P]rejudice means there is a reasonable likelihood that the outcome of the trial would have been different but for the deficient performance.").

To prove that he was prejudiced by his trial counsel's failure to have closing arguments taken down, Ealey must show a "reasonable probability" that, but for his counsel's unprofessional errors, "the

_____

closing arguments," "[c]ounsel's practice was within the broad range of professional conduct afforded to trial counsel in a non-death penalty case such as the one at bar"). See also *Norton v. State*, 293 Ga. 332, 339 (2013) (concluding that, where trial counsel testified that closing arguments "were not taken down because of cost considerations" but any "objectionable questions" would have been objected to and preserved for appeal, trial counsel's actions were "'within the broad range of professional conduct afforded to trial counsel in a non-death penalty case such as the one at bar'") (citing *Dunlap*, 291 Ga. at 53).

[10] See e.g., *Strong v. State*, 309 Ga. 295, 303 (2020); *Grier v. State*, 305 Ga. 882, 886–87 (2019); *Thompson v. State*, 302 Ga. 533, 542 (2017).

result of the proceeding would have been different," which "burden is a heavy one." *Watts v. State*, 308 Ga. 455, 458 (2020) (cleaned up). And Ealey has made no showing as to how the closing arguments would have been helpful or harmful to his case, such that the outcome of his trial would have been different. See id. Consequently, Ealey has failed to carry his burden to show ineffectiveness under *Strickland,* and this ineffective assistance of counsel claim fails.

5. In Ealey's final enumeration of error, he contends that, even if this Court were to decide that the trial court's errors and trial counsel's deficient performance do not warrant a new trial, the Court should nevertheless conclude that a new trial is warranted based on the combined effect of those errors. See *State v. Lane*, 308 Ga. 10, 21–23 (2020).

"To establish cumulative error, [an appellant] must demonstrate that 'at least two errors were committed in the course of the trial' and 'considered together along with the entire record, the multiple errors so infected the jury's deliberation that they

denied the petitioner a fundamentally fair trial.'" *Wood v. State*, 316 Ga. 811, 821 (2023) (quoting *Lane*, 308 Ga. at 21). When this Court considers whether "the cumulative effect of presumed errors by trial counsel and the trial court" entitles the appellant to a new trial, we consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel. *Patterson v. State*, 314 Ga. 167, 181 (2022).

Here, after collectively considering the cumulative prejudice from any assumed errors discussed in Divisions 2 and 3 — i.e., the admission of portions of the gun incident and the robbery incident under Rule 404(b) and the admission of hearsay testimony from the detective — and any assumed deficiency in Division 4, we conclude that, given the strong evidence of Ealey's guilt recounted above, the combined impact of these errors and any deficient performance of counsel "is insufficient to show a reasonable probability that the results of the proceeding would have been different," *Patterson*, 314 Ga. at 181, or that the prejudicial effect thereof denied Ealey a fundamentally fair trial. And Ealey has not demonstrated

otherwise. See *Huff v. State*, 315 Ga. 558, 568 (2023) (holding that the appellant's cumulative-error claim failed because the appellant did not demonstrate that "the prejudicial effect of the assumed trial court errors ... denied him a fundamentally fair trial, given the strong evidence against him"). As such, Ealey's cumulative-error contention also fails.

*Judgment affirmed. All the Justices concur, except Peterson, C.J., Warren, P.J., and Pinson, J., who concur specially as to Division 4 (d).*

PETERSON, Chief Justice, concurring specially.

I concur in the judgment of the Court, and in the opinion of the Court except for Division (4) (d). I agree with that division's holding that Ealey failed to show that trial counsel's failure to have argument of counsel transcribed was prejudicial. But the opinion then goes on also to hold that trial counsel did not perform deficiently in failing to have argument of counsel transcribed. I cannot join that additional holding about deficiency; it is unnecessary given our holding on prejudice, no precedent of ours compels that result, and I am uncertain whether that result is correct on the facts of this case. See *Strickland v. Washington*, 466 US 668, 697 (1984) ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). I am also skeptical that our prior precedent rejecting such claims on deficiency grounds was correct, even on the different factual records of those

45

cases. See, e.g., *Norton v. State*, 293 Ga. 332, 339 (2013). It seems to me that failing to request that arguments and voir dire be transcribed may often be deficient performance.

In *Norton*, we held that because there is no legal requirement on trial courts to ensure that arguments are transcribed, see OCGA § 17-8-5, or voir dire in non-death penalty cases, see *State v. Graham*, 246 Ga. 341 (1980), trial counsel did not perform deficiently by not requesting that these portions of the trial be taken down. See *Norton*, 293 Ga. at 339. But whether a *trial court* is required to ensure that arguments and voir dire are transcribed is a completely separate question from whether it is reasonable for *trial counsel* to fail to have arguments and voir dire transcribed. We also noted in support of our no-deficiency conclusion that counsel testified that "these portions of the trial were not taken down because of cost considerations, and that had objectionable questions been asked or argument been made, he would have objected and caused the court to make a record of them to preserve them for appellate review." 293 Ga. at 339. It seems to me that neither of

46

those points made counsel's decision reasonable. First, cost considerations cannot be a legitimate reason for trial counsel to decline to have argument and voir dire transcribed when, as in *Norton*, trial counsel represents an indigent defendant. It has long been settled that in criminal cases, "[a]n indigent, on appeal, is entitled as a matter of right to a free copy of the transcript of trial court proceedings in which he has been a party." *Stalling v. State*, 231 Ga. 37, 38 (1973), citing *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (indigent criminal defendant entitled to trial transcript at public expense). See also *Roberson v. State*, 300 Ga. 632, 635 (2017). Second, trial counsel's assertion that he would have objected if there was something objectionable ignores one of the principal reasons to have a transcript: trial counsel may fail to notice something objectionable.[11]

---

[11] The cases *Norton* cites to support its conclusion that trial counsel did not perform deficiently are also lacking. See 293 Ga. at 339 ("Counsel's actions were 'within the broad range of professional conduct afforded to trial counsel in a non-death penalty case such as the one at bar.'") (quoting *Dunlap v. State*, 291 Ga. 51, 53 (2012) and citing *Wright v. State*, 274 Ga. 730, 732 (2002)). In *Dunlap*, trial counsel testified that "it was his custom and practice not to request the transcription of voir dire or opening and closing arguments" and

Moreover, considering the frequency with which we assess harm and prejudice for evidentiary claims by evaluating how improperly admitted evidence is used during arguments, it seems to me that the failure to request that these portions of the trial be taken down would rarely be a reasonable trial strategy. See, e.g., *Harris v. State*, 321 Ga. 87, 104 (2025) (referring to closing argument when evaluating whether improperly admitted evidence was harmful); *Baker v. State*, 318 Ga. 431, 448 (2024) (same); *Strong v. State*, 309 Ga. 295, 317 (2020) (same); *Robinson v. State*, 308 Ga. 543, 552, (2020) (same); *Thompson v. State*, 302 Ga. 533, 542 (2017) (same).

In any event, whether or not *Norton* and similar cases have

---

"if he had any objections to those portions of the trial, it was his custom to object and make sure a recording was made[.]" 291 Ga. at 53. But the practice of not requesting a transcript of argument and voir dire does not transform an unreasonable trial strategy into a reasonable one. And again, the decision not to transcribe these portions of the trial because nothing objectionable happened does not account for (the not uncommon) circumstance of trial counsel failing to object to something objectionable or using arguments to support a different enumeration of error. As for the citation to *Wright*, the Court did not even discuss deficient performance (and instead resolved the defendant's claim on prejudice) so it is unclear why we cited it for this point in *Norton*. See *Wright*, 274 Ga. at 732 ("The failure to show harm or prejudice is fatal to [the defendant's] claim.").

been rightly decided is beside the point here. The United States Supreme Court has made clear that *Strickland* deficiency is not susceptible to bright-line rules, and instead must be assessed in each case based on all the case-specific circumstances. See *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000) (rejecting bright-line deficiency rule of First and Ninth Circuits "as inconsistent with *Strickland*'s holding that the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances"). And here, although the State argues that *Norton* controls because it rejected an "identical" claim, the State points to no testimony from counsel offering explanations similar to those in *Norton*. So *Norton* does not control.

To sum up: it seems to me that there are few cases where it will be objectively reasonable for trial counsel (especially for indigent criminal defendants entitled to a transcript at public expense) to fail to ensure that argument and voir dire is transcribed. It is hard to square the importance we place on arguments when reviewing a defendant's claims on appeal, with trial counsel's decision not to

49

request those arguments be transcribed — especially when the request comes at no cost to the defendant and recreating what occurred during these proceedings, held months or sometimes years earlier, is incredibly difficult. Cf. *Drennon v. State*, 314 Ga. 854, 869 n.6 (2022) (noting procedures trial judges could adopt to avoid "the difficult task of re-creating on appeal what occurred at bench conferences held months or years earlier"). Indeed, Ealey argues that he has been prejudiced by counsel's failure to request that closing arguments be transcribed because his "burden to show harm for his 404(b) argument is more difficult without closing arguments." Trial counsel's failure to request that closing arguments be transcribed can, and often does, hamstring the defendant's ability to show prejudice on other claims.

Nevertheless, even if trial counsel performed deficiently here, I agree with the Court that Ealey's claim fails because he did not demonstrate that trial counsel's deficient performance prejudiced him in any way. Accordingly, I concur in the Court's judgment.

I am authorized to state that Presiding Justice Warren and

Justice Pinson join this concurrence.